Slip-Op. 08-24

UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - - -- -x
DORBEST LTD.; RUI FENG WOODWORK   :
(DONGGUAN) CO. LTD.; RUI FENG     :
LUMBER DEV. (SHENZHEN) CO. LTD.,  :
                                  :
            and                   :
                                  :
AM. FURNITURE MFRS. COMM. FOR     :
LEGAL TRADE; VAUGHAN-BASSETT      :
FURNITURE CO. INC.; CABINET       :
MAKERS, MILLMEN, & INDUS.         :
CARPENTERS LOCAL 721; UBC S.      :
COUNCIL OF INDUS. WORKERS LOCAL   :
2305; UNITED STEEL WORKERS OF AM. :
LOCAL 193U; CARPENTERS INDUS.     :
UNION LOCAL 2093; TEAMSTERS,      :
CHAUFFEURS,WAREHOUSEMEN & HELPERS :
LOCAL 991; IUE INDUS. DIV. OF CWA :
LOCAL 82472                       :
                                  :
     Plaintiffs/Defendant-        :
               Intervenors,       :
                                  :
               v.                 : Before: Pogue, Judge
                                  : Consol. Ct. No. 05-00003
UNITED STATES,                    :
                                  :
               Defendant,         :
                                  :
DONGGUAN LUNG DONG/DON HE         :
ART HERITAGE INT'L, LTD/SUPER ART :
FURNITURE CO./ARTOWRK METAL &     :
PLASTIC CO./JIBSON INDUS. LTD./   :
ALWAYS LOYAL INT'L; FORTUNE GLORY :
LTD. (HK LTD.)/ NANHAI JIANTAI    :
WOODWORK CO.; FINE FURNITURE      :
(SHANGHAI) LTD.; COASTER CO. OF   :
AM.; COLLEZIONE EUROPA, USA,      :
INC.; FINE FURNITURE DESIGN &     :
MKTG. LLC; GLOBAL FURNITURE, INC.,:
HILLSDALE FURNITURE, LLC;         :
KLAUSSNER INT'L, LLC; MAGNUSSEN   :
HOME FURNISHINGS INC.;            :
L. POWELL CO.; RIVERSEDGE         :
FURNITURE CO.; WOODSTUFF MFG.     :
INC., D/B/A SAMUEL LAWRENCE;      :
SCHNADIG    CORP.; GOOD COS.;     :
STANDARD FURNITURE MFG. CO.       :
                                  :
          Defendant-Intervenors.  :
- - - - - - - - - - - - - - - ----x
```

[Commerce's remand determination sustained in part and remanded in part].

Troutman Sanders LLP (<u>Jeffrey S. Grimson</u>, <u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Brady W. Mills</u>) for Dorbest Limited <u>et al.</u>;

King & Spalding, LLP (<u>Joseph W. Dorn</u>, <u>Stephen A. Jones</u>, <u>Jeffrey M. Telep</u>, <u>J. Michael Taylor</u>, <u>Elizabeth E. Duall</u>) for the American Furniture Manufacturers Committee for Legal Trade <u>et al.</u>;

Jeffrey S. Bucholtz, Acting Assistant Attorney General; <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (<u>Brian A. Mizoguchi</u>, <u>Michael D. Panzera</u>); <u>Rachel E. Wenthold</u>, Senior Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for the United States Department of Commerce;

Mowry International Group, LLC (<u>Jill Cramer</u> and <u>Kristin H. Mowry</u>) and <u>Howe & Russell, PC</u> (<u>Kevin Russell</u>) on behalf of Art Heritage International, Limited <u>et al.</u>; and

Trade Pacific, PLLC (<u>Robert G. Gosselink</u>) on behalf of Dongguan Lung Dong/Dong He <u>et al</u>.

Decided: February 27, 2008

POGUE, Judge: This matter is before the court following partial remand. In its prior opinion, the court reviewed the Department of Commerce's ("Commerce's") affirmative less than fair value determination for subject merchandise and the antidumping duty order and dumping margins subsequently imposed. <u>Dorbest Ltd. v. United States</u>, 30 CIT _, 462 F. Supp. 2d 1262 (2006)("<u>Dorbest</u>");[1] <u>see also</u>, <u>Wooden Bedroom Furniture From the People's Republic of China</u>, 69 Fed. Reg. 67,313, 67,317 (Dep't Commerce Nov. 17, 2004)(final determination of sales at less than

---

[1]Familiarity with the court's prior decision is presumed.

fair value)("Final Results") amended by Wooden Bedroom Furniture From the People's Republic of China, 70 Fed. Reg. 329, 330 (Dep't Commerce Jan. 4, 2005)(notice of amended final determination of sales at less than fair market value and antidumping duty order). During the investigation leading to the Final Results, Commerce used various methods to value the factors of production of the subject merchandise in order to approximate the normal value of the merchandise, and to make its determination regarding dumping. See Dorbest, 30 CIT at _, 462 F. Supp. 2d at 1265, n. 1. A number of these valuations were remanded for redetermination pursuant to the court's order. Id. at 1321-22. Commerce's remand determination as to the following issues are now before the court:

1. Labor wage rate
2. Valuation of specific factors of production
    a. Hooks and connectors
    b. Resin
    c. Mirrors
    d. Cardboard
    e. Metal spare parts, non-scope metal canopies and other metal
    parts
3. Selection of surrogate companies to calculate financial ratios
4. Calculation of financial ratios
5. Calculation of Separate/Section A rate

For the reasons discussed below, the court sustains in part and remands in part Commerce's redetermination pursuant to court remand.

### STANDARD OF REVIEW

The court reviews remand determinations for compliance with the court's remand order. NMB Sing. Ltd. v. United States, 28 CIT

1252, 341 F. Supp. 2d 1327 (2004)(affirming International Trade Commission's determinations on remand where the determinations were in accordance with law, supported by substantial evidence, and otherwise satisfied the remand order); see also Olympia Indus., Inc. v. United States, 23 CIT 80, 82, 36 F. Supp. 2d 414, 416 (1999)(affirming after "review[ing] Commerce's compliance with these instructions in its Remand Results" and finding the determination to be supported by substantial evidence and in accordance with law). In addition, any factual findings on remand must be supported by substantial evidence and the agency's legal determinations must be in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); see, e.g., AG der Dillinger Huttenwerke v. United States, 28 CIT 94, 95, 310 F. Supp. 2d 1347, 1349 (2004)(holding remand determination to legal and factual standards set out in 19 U.S.C. § 1516a(b)(1)(B)).


## DISCUSSION

### 1. Labor wage rate

In Dorbest, the court analyzed the Department of Commerce's ("Commerce's") use of its linear regression model to calculate an approximation of the People's Republic of China's ("PRC's") wage rate.[2] This method uses the reported Gross National Products

---

[2]Following the commencement of this litigation, Commerce requested, and was granted, a voluntary remand to correct some
(continued...)

("GNIs") and wage rates[3] of the market economy countries meeting Commerce's criteria to create a linear function that is then used to calculate approximations of wage rates based on a country's per capita GNI.  Commerce then specifically determines the wage rate that corresponds to the PRC's reported GNI,[4] and uses that wage rate as an input in further calculations.

As-applied invalidity:

     In its initial analysis, the court first found that Commerce's use of a data set that excluded countries that met its standards

---

     [2](...continued)
flaws in its wage rate calculation.  Therefore, the court in Dorbest was reviewing Commerce's determination after its voluntary remand.  All discussions here of Commerce's remand determination are in reference to its determination following the court-ordered remand.

     [3]Commerce selected the wage rate data for its regression from the Yearbook of Labour Statistics, published by the International Labour Organization ("ILO"), and GNI data was selected from the World Bank. Final Results of Redetermination Pursuant to Court Remand 4, n. 2, and Annex II ("Remand Results").

     [4]The court instructed Commerce to explain why it uses the reported GNI from the PRC for calculating wage rate, but does not use the PRC's reported wage rate, as both are based on wages. Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1298 (granting that there could be reasonable explanations for why Commerce found one to be reliable and the other not).  In its redetermination, Commerce states that it has found that "each NME's GNI, as published in the World Bank Indicators, is the 'best available' metric for establishing economic comparability for all surrogate values, including labor," because all available sources or metrics would be "[]tainted by the non-market nature of the economy underlying an NME's GNI". Remand Results 11. No party challenges this aspect of Commerce's remand determination, and given the dearth of data, Commerce's determination appears to the court to be reasonable in this instance.

for inclusion did not constitute use of the best available information and was arbitrary and therefore not supported by substantial evidence. Dorbest, 30 CIT at _, 462 F. Supp. 2d at 1295 (2006). Thus, the court instructed that Commerce either "(a) justify why its data set constitutes the best available information; or (b) incorporate those countries meeting its criteria into the data set . . . ." Dorbest, 30 CIT at _, 462 F. Supp. 2d at 1321.

On remand, Commerce "reconsidered the data set used in this case and . . . determined to include all data that meet [Commerce's] suitability requirements and that were available at the time the 2004 wage rate was calculated." Final Results of Redetermination Pursuant to Court Remand 4 ("Remand Results").[5] In addition, Commerce engaged in notice and comment rulemaking to arrive at a revised methodology, detailed at Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. 61,716 (Dep't Commerce Oct. 19, 2006)("Antidumping Methodologies"); see also Expected Non-Market Economy Wages: Request for Comment on Calculation Methodology, 70 Fed. Reg. 37,761 (Dep't Commerce June

---

[5]During Commerce's initial investigation, Dorbest had argued that Commerce should perform the regression analysis only using data from economically comparable countries. Alternatively, Dorbest argued that Commerce should include data from all countries that met its stated criteria, which it has now done. See, e.g., supra.

30, 2005)("<u>Expected NME Wages</u>").  Commerce applied the results of its rulemaking procedure to address the court's data selection concerns here.[6]

Commerce has complied with the court's order, and this aspect of the redetermination is not challenged by any of the parties, <u>see</u> Comments Pls. Dorbest on Commerce's 2d Remand Redetermination 6 ("<u>Dorbest Comments on Remand Results</u>"); the court therefore affirms this aspect of the redetermination.

<u>Distortions in Wage Rate Calculation</u>:

In <u>Dorbest</u>, the court also found Commerce's use of its wage rate methodology unreasonable, absent sufficient justification for its calculations, particularly as Commerce had not engaged in notice-and-comment rulemaking when developing its methodology.  The court chose not to examine each aspect of Commerce's chosen methodology without the benefit of the agency's reasoning.  Nonetheless, the court noted that, while in theory the regression analysis used by Commerce could be considered a reasonable use of the best available information, Commerce's regression model appeared to produce distortions.  For example, when used to predict wage rates of market economies such as India (whose reported wage

---

[6]As a result of its use of the larger data set on remand, Commerce changed its estimates of the PRC wage rate from $0.85, determined during its voluntary remand, <u>see</u> <u>Wooden Bedroom Furniture from the People's Republic of China</u> at 25 (Dep't Commerce Aug. 1, 2005)(final results of redetermination pursuant to court remand orders), to $0.77.  <u>Remand Results</u> at Annex II.

rate is known), the model predicts a wage rate three times higher than India's reported wage rate. <u>Dorbest</u>, 30 CIT at_, 462 F. Supp. 2d at 1296-97. (Commerce found India's economy to be closest to the PRC's. <u>Id.</u>) Further, in performing its regression analysis, Commerce chose not to use regression through the origin ("RTO") methodology, which employs the assumption that countries with a GNI of zero have wage rates of zero.[7] The court noted the criticism that because Commerce used a regression model that had a positive y-intercept, rather than the RTO method, its regression model appears to overstate wage rates of low-income countries, so that the calculated wage rate is higher than the wage rates of any countries Commerce might otherwise look to as surrogates, making the methodology neither the most accurate nor fair. The court instructed Commerce to "reconsider its use of its methodology or an alternative method for determining the labor rate for the PRC in this case." <u>Dorbest</u>, 30 CIT at_, 462 F. Supp. 2d at 1321.

Commerce has now engaged in notice and comment rule-making regarding data selection and methodology for determining labor wage rates for non-market economies. <u>See, e.g.</u>, <u>Expected NME Wages</u>, 70 Fed. Reg. 37,761; <u>see also</u>, <u>Antidumping Methodologies</u>, 71 Fed. Reg. 61,716. During this process, Commerce considered the parties'

---

[7]As noted in <u>Dorbest</u>, Commerce's original regression, which did not use RTO methodology, appeared to create a distortion in this regard by producing a wage rate of $0.392 for a hypothetical country with zero GNI. <u>Dorbest</u>, 30 CIT at_, 462 F. Supp. 2d at 1296-97.

suggestions for altering its methodology. Ultimately, Commerce determined to employ the same methodology (Ordinary Least Squares linear regression) as it had in its <u>Final Results</u> using a data set of all countries meeting its selection criteria. As such, Commerce's regression model assumes that wage rates and GNI have an approximately linear relationship. <u>See</u> <u>Expected NME Wages</u>, 70 Fed. Reg. at 61,720 (stating that there is a "consistent relationship over time between wage rates and GNI"). This methodology was applied during the remand proceedings now at issue.

In its remand determination, Commerce concluded that "there is no inherent distortion in the regression model that would lead to systematic overestimation of wages." <u>Remand Results</u> 7. As to arguments regarding India's calculated versus actual wage rate, Commerce asserts that India's reported actual wage rate is anomalously low, and, as a result, <u>any</u> estimate based on data from other countries will produce an over-estimate of India's wage rate. No party challenges this aspect of Commerce's remand determination.

In making its determination, Commerce considered, but ultimately rejected, methods for determining the wage rate, "including choosing a single wage rate from an economically comparable market economy, averaging the wage rates of economically comparable market economies, and running the regression only on economically comparable countries." <u>Remand Results</u> 12. Commerce concluded that "none of these alternatives reduces the potential

for distortion or increases either fairness or predictability." Id. Ultimately, Commerce chose to continue with its prior methodology, considering it preferable to rely on "the broadest data set possible to arrive at a wage rate that is directly tied to each NME's GNI." Id.

Commerce rejected use of data from a single, surrogate country because there was so much variation in wage rates that Commerce found the use of a single surrogate would "undermine the accuracy, fairness and predictability of [Commerce's] calculations." Remand Results 13. According to Commerce, the regression technique enhances predictability because the variation in wage rates at low GNIs means that choosing just one would lead to great variability in data used for different NME countries. Commerce also noted that because not all countries reported suitable wage rates every year, using a larger group and "averaging" the data by means of regression analysis was a more desirable option. Remand Results 16. The court finds that Commerce weighed this method and, on this record, reasonably chose to reject it.

Commerce also considered other averaging methods. Commerce found that a method of averaging the wage rates of the eight reporting countries with the closest GNIs to a given NME was flawed for countries with small GNIs, because there were no reported wage rates from countries with GNIs lower than US $420. Thus, all countries with lower GNIs would have wage rates determined based on

averages for countries that all had higher GNIs (very likely leading to an overestimate). Commerce therefore found that its regression analysis was superior because it allows for wage rates to be calculated for NME countries with smaller GNIs than Commerce has data for. The court finds this conclusion to be reasonable.

Commerce also considered (and rejected) limiting its regression analysis to data from a range of economies at comparable levels of development to each NME. Remand Results 18. Commerce found that "a basket of 'economically comparable' countries could be extremely small." Id. Commerce found this problematic because the resulting regression "would be highly dependent on each and every data point." Id. This, in turn, was problematic because for countries with GNIs less than US $1000, "observed wage rates did not increase in lockstep with increases in GNI." Id. In other words, the relationship between wage rate and GNI for countries with low GNIs is not necessarily linear. Rather, there is a "global relationship between wage rates and GNI." Id. Commerce therefore concluded that this global relationship was better captured by "a larger basket [of data]." Id.[8] Here, Commerce

---

[8]No party here claims that as a result of including data from countries with much larger wage rates and GNIs (with a stronger linear correlation than wage rates and GNIs for smaller countries), the linear regression is less accurate for countries with small GNIs, nor that the consequent, higher R-square value--resulting from the use of the inclusive data set--is predominantly reflective of a higher reliability for countries with large GNIs. Specifically, no party challenges the

(continued...)

reasonably executed the task of choosing between two, imperfect data sets.

Next, Commerce considered and rejected Dorbest's argument that use of RTO methodology would result in less distortion for countries with low GNIs.  Commerce gives multiple explanations for its choice not to use RTO, including the fact that the relationship between GNI and wage rates might not be linear near the origin. Remand Results 19.[9]  Commerce states that it is not trying to find the correct econometric model for wage rate as a function of GNI, but rather, is using all the data available and assuming linearity; thus, Commerce is simply "using a statistical tool, regression analysis, to generate a variable average of wages." Remand Results

---

[8](...continued)
government's working assumption that including data from more countries results in a more accurate prediction for countries of all GNIs as evidenced by the higher R square value. See, e.g., Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1298, n. 32 (noting that AFMC, for example, had argued that changing the data set would create "distortions and results that are less reliable than Commerce's existing methodology" as a result of the fact that Commerce's (initial) data set of 56 countries lead to an adjusted R square of 0.92 while if only the low-income and lower-middle income countries were used, the adjusted R square is only 0.47. (citations omitted)); see also Antidumping Methodologies, 71 Fed. Reg. at 61,720-21 (noting the high R square value for the regression when all countries were included, and the fact that wages did not increase in "lock-step" for countries with low GNI).

[9]Petitioner argued, and Commerce agreed, that "[i]f the data are far from the origin, we have no evidence that the linearity applies over this expanded range. For example, the response may increase exponentially near the origin and then stabilize into a near linear response in the region of the typical inputs." Remand Results at 27 ((citations omitted)).

28 (emphasis omitted).  Commerce explained that it does not
"theorize on the precise nature of the relationship between wage
rates and GNI near the origin.  Rather, [Commerce] notes that the
universe of relevant data does <u>not</u> indicate that the intercept
relating to this universe of data is zero." <u>Remand Results</u> 29.
Commerce asserts that setting the y-axis intercept to zero would be
inappropriate, because it would "impose a theoretical constraint on
the calculation of expected NME wage rates." <u>Remand Results</u> 10
(citing <u>Dorbest</u>, 30 CIT at __, 462 F. Supp. 2d at 1296-97).  Lastly,
Commerce explains that "because no country has a zero wage rate,
the intercept will never, in reality, be zero." <u>Remand Results</u> 10.

     Dorbest argues that here, there is "a strong reason to believe
that when the independent variable is zero, the dependent variable
is also zero." <u>Dorbest Comments on Remand Results</u> 9.[10]  Dorbest
points to discrepancies between reported wage rates for market
economies and the wage rates predicted by Commerce's regression,
arguing that these discrepancies show that Commerce's methodology
still leads to distorted rates.  Commerce examined Dorbest's
arguments during its remand determination, as well as Petitioner's
argument that "predicted wages based on regression <u>without</u>
employing RTO are, on average, $0.02 higher than actual wages.  In

---

     [10]During oral argument, Dorbest conceded that RTO was not
necessary to get the most accurate estimate of wage rates, but
conditioned the concession on the court's acceptance of its GLS
argument.

contrast, the regression results <u>with</u> RTO underestimate wages for the same lowest income countries by over $0.27. . . ." <u>Remand Results</u> 27. Accordingly, on remand, Commerce examined its methodology, and ultimately chose to use only "real world data" rather than include a hypothetical data point, such as the origin, and thus decided against using RTO. Commerce stated that "[Commerce] believes that it is neither reasonable nor fair to place a constraint on the calculation that is 'theoretically consistent for a hypothetical country' over a method that provides the best fit with the actual data, with the result to be applied to the actual NME countries and respondents involved." <u>Remand Results</u> 28. Thus, Commerce chose not to hypothesize as to whether the relationship maintained its general linearity near the origin. The court finds that, based on the record here, Commerce's determination to use only real-world data and not to perform RTO was reasonable. As a legal matter, on this record, Commerce may reasonably choose to rely solely on real-world data. As a question of fact, Commerce's weighing of the record evidence was not unreasonable.

In <u>Dorbest</u>, the court also noted Respondents' allegation that a Generalized Least Squares ("GLS") model would be more appropriate than an Ordinary Least Squares ("OLS") model, as GLS could correct

Consolidated Ct. No. 05-00003                                      Page 15

for the heteroscedasticity[11] apparent in the data set used by
Commerce. <u>Dorbest</u>, 30 CIT at_, 462 F. Supp. 2d at 1298, n. 33.  The
court did not examine the reasonableness of Commerce's choice at
that time, but noted that the suggestion (as well as the underlying
issue of heteroscedasticity) was "an example of a step Commerce
could consider on remand." <u>Id.</u>[12]

        On    remand,    Commerce    considered    the    effect    of
heteroscedasticity in its data set, and Dorbest's arguments that
because of heteroscedasticity, a GLS regression technique would
yield  more  accurate  results  than  the  OLS  technique  used  by
Commerce. <u>Remand Results</u> 31-32.  Commerce chose to use OLS rather

_____

        [11]Heteroscedasticity occurs when the variance of error terms
is not constant.  Here, for example, Dorbest asserts that the
data points are more widely distributed for large GNIs, leading
to a larger variance.  In cases where a data set is
heteroscedastic, OLS is not the best estimator of the slope of a
line.  That is because the OLS method gives the same amount of
weight to data with greater variability as data with less
variability.  The GLS method weights each data point used in the
regression analysis based on its variance, giving more weight to
data with lower variance.  For heteroscedastic data sets, GLS is
considered the best linear unbiased estimator (or "BLUE").  For
homoscedastic data sets, OLS is BLUE.  Use of OLS on a
heteroscedastic data set will still yield a linear, unbiased
estimator; however, it will not be the best. DAMODAR N GUJARATI,
BASIC ECONOMETRICS Ch. 11, App'x A at 900 (4th ed. 2003)("<u>Basic
Econometrics</u>").

        [12]The court did not opine on whether Commerce should use a
Generalized least Squares Model instead of an Ordinary Least
Squares Model, as suggested by Dorbest, to account for
heteroscedasticity. <u>Dorbest</u>, 30 CIT at_, 462 F. Supp. 2d at 1298,
n. 33 ("[t]he court, of course, does not know whether or not this
would improve the accuracy of the model, but this is an example
of a step Commerce could consider on remand.").

than GLS because of the difficulty of detecting and correcting for heteroscedastity.    Commerce also determined that to take heteroscedasticity into account, it would have to determine from year to year whether its data set was heteroscedastic; if it were, Commerce would have to use a Generalized Least Squares model of regression rather than an Ordinary Least Squares model; if not, it would use the Ordinary Least Squares model currently in use. Commerce found that such a system would not be predictable from year to year.

Dorbest argues that "[u]se of GLS would correct for heteroscedasticity when present, and leave the result unaltered where no heteroscedasticity is present." <u>Dorbest Comments on Remand Results</u> 18.  Thus, Dorbest suggests that Commerce would not need to determine, from year to year, which methodology to use, because for homoscedastic data sets, the GLS equation becomes the same as the OLS equation. <u>See, e.g.</u>, Damodar N Gujarati, Basic Econometrics ch. 11 (4th ed. 2003)("<u>Basic Econometrics</u>").  Dorbest further argues that Commerce's statutory obligation is "to calculate dumping margins as accurately as possible," and that GLS regression methodology represents a more accurate calculation.  Defendant-intervenors AFMC argue that there are drawbacks to using GLS, particularly that "for GLS to work accurately, the nature of the heteroscedasticity must be known in advance." AFMC's Rebuttal Comments on Final Results of Redetermination Pursuant to Court Remand 17 ("<u>AFMC Rebuttal</u>

Comments on Remand Results"). In other words, "[i]n order to implement GLS correctly . . . one needs to know the form of the heteroscedasticity – on which variables the variance depends and how it depends on those variables." Id. Thus, AFMC points out that without more information on the relationship between wage rate and GNI, GLS might not be practical to implement.

On remand, Commerce stated that it considers itself simply to be engaging in an exercise in averaging, and that "[t]he only relevant aspect of the regression is the line itself, which represents the variable average of the entire universe of data." Remand Results 32. Dorbest argues that Commerce's protestations that it is not engaging in econometrics do not make it so. According to Dorbest, "the underlying assumptions of econometrics are extremely relevant to Commerce's purpose, and Commerce cannot just define those assumptions away." Dorbest Comments on Remand Results 17.

It is true that Commerce cannot use econometric methodology in its calculations and then refuse to verify that its methodology produces accurate results by claiming that it is merely "utiliz[ing] regression analysis as a tool to arrive at a variable average." To the court, Commerce's tool is econometrics.[13]

_____

[13]According to Gujarati, cited by all parties, one definition of econometrics goes as follows: "econometrics may be defined as the quantitative analysis of actual economic phenomena based on the concurrent development of theory and observation, (continued...)

However, on remand, Commerce further explained that "even if [Commerce's] regression analysis were to be characterized as an econometric model, the potential for heteroscedasticity would not affect the unbiasedness of the estimator." Remand Results 32 (citing Basic Econometrics 381). As explained in footnote 11, supra, in the presence of heteroscedasticity, OLS is still a linear, unbiased estimator. As a legal matter, therefore, Commerce may, on this record, use OLS. It may not, however, as a factual question, be the "best" estimator. Commerce, however, also stated that "heteroscedasticity is not easily detected or corrected for, as evidenced by the many tests and potential correction methods presented in the econometric and statistical texts in [Dorbest's exhibits]." Remand Results 32. On this remand record, the court cannot disagree. While Dorbest cites its preferred statistical analysis, claiming that it provides a more accurate result, the record here discloses that, because of the "many facts and potential methods presented" in the econometric and statistical texts in [Dorbest's Exhibits], Commerce was required to choose between a number of imperfect alternatives. Thus, considered in this context, a reasonable mind can conclude that Commerce chose the best information available. Commerce considered Dorbest's

---

[13](...continued)
related by appropriate methods of inference." Basic Econometrics 1 (citing P.A. Samuelson, T.C. Koopmans, and J.R.N. Stone, "report of the Evaluative Committee for Econometrica," Econometrica, vol. 22, no. 2, Apr. 1954, pp. 141-146).

arguments as to the merits of using GLS rather than OLS regression methodology, and reasonably rejected GLS methodology, and the data it produced, as it did all the alternatives proposed to its chosen approach.  Accordingly, the court will affirm its choice.

## 2. Valuation of Specific Factors of Production

A. Hooks and Connectors

In its _Final Results_, Commerce valued Dorbest's hooks and connectors using the Indian Harmonized Tariff System ("HTS[I]") subheading 8302.4200, HTS[I][14] as the appropriate category for comparison.  Dorbest challenged this determination, arguing that Commerce should have used expired HTS[I] category 8302.1009.[15]  The court noted that "Commerce [had] not articulated in what way the inputs 'closely resemble' the HTS[I] subheading description,"and remanded the choice of a category for the valuation of hooks and connecters in order for Commerce to "explain how the chosen subheading is rationally connected to the factor input" or to "find another suitable subheading or data set." _Dorbest_ 30 CIT at_, 462 F. Supp. 2d at 1309.

In its remand determination, Commerce considered Dorbest's description of its connectors and hooks, compared the subheading

---

[14]8302.4200, HTS[I] includes: hardware, fixtures, castors etc. and parts, base metal: other fittings etc. suitable for furniture.

[15]8302.1009, HTS[I] includes: hardware, fixtures, castors, etc., and parts, base metal: hinges & parts thereof.

chosen in the Final Results to the inputs, and concluded that
8302.4200 was indeed the appropriate category for valuation. Remand
Results 36.   Commerce also "considered whether other HTS
subheadings would be more specific to the inputs in question." Id.
at 37.  Commerce found that Dorbest's suggested subheading was not
appropriate because, in addition to being expired, it was limited
to "hinges and parts thereof," whereas, after considering the
definition of hinges, Commerce found that "the record evidence
supports a finding that hooks and connectors are not hinges." Id.
at 37-38.  Dorbest does not contest this conclusion, and the court
finds that Commerce's determination on remand is reasonable.

B. Resin

        During Commerce's initial determination, Dorbest suggested
that Commerce value Dorbest's resin applique input using expired
subheading 3926.4009, HTS[I].[16]   In its Final Results, Commerce
chose not to use an expired subheading, but rather a heading it
later argued before this court "most closely resembles Dorbest's
proposed but expired category, and comports with Commerce's
preference that the factor value information be contemporaneous."
Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1310 (quoting Def's Resp.
Court's March 10, 2006 Qs 23).   Specifically, Commerce valued

---

        [16]3926.4009, HTS[I] includes: articles of plastics (inc.
polymers & resins).

Dorbest's resin applique using HTS subheading 3926.3090, HTS[I].[17] The administrative record showed that Commerce based its decision on the expired nature of Dorbest's proposed subheading. Memorandum from James H. Jochum to Jeffrey A. May, Issues and Decision Memorandum for the Less-Than-Fair-Value Investigation of Wooden Bedroom Furniture from the People's Republic of China 170-71 (Cmt. 19)(Dep't Commerce Nov. 8, 2004), P.R. Doc 1933, available at http://ia.ita.doc.gov/frn/summary/prc/04-25507-1.pdf ("Issues & Decision Mem.").

      The court remanded, stating that Commerce had not "explained in what way the selected subheading resembles the suggested subheading, or, more importantly, the factor input." Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1311.  The court ordered that Commerce provide an explanation or analysis for its choice on remand.  The court also noted that subheading 3926.4009, HTS[I] "appears to apply to ornamental articles while subheading 3926.3090, HTS[I], appears to apply to furniture fittings," Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1310, and therefore further ordered that if Commerce were to find that the factor input was ornamental in nature, it would "need[] to then determine what the appropriate subheading would be to reflect that it is ornamental." Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1311.

_____

      [17]3926.3090, HTS[I] includes: other articles of plastics and articles of other materials . . . fittings for furniture, coachwork, or the like.

During the remand proceeding, Commerce determined that the
resin applique input was ornamental in nature.  This determination
was based on information in the record, including, inter alia,
Dorbest's description of the input as "PVC and polymer used for
decorating."  Remand Results 39 (citing Dorbest HTS submission at
attch. 1)(emphasis added).  Commerce further determined that the
proper classification for the input was neither Dorbest's
originally suggested subheading, due to it having already expired
and Commerce's stated emphasis on contemporaneity, nor was it
Commerce's initially chosen classification, as that did not
"appear[] to include articles that are ornamental in nature."
Remand Results 40.   Rather, Commerce found that subheading
3926.4099, HTS[I][18] most closely resembled Dorbest's description of
its input.[19]  In making its decision, Commerce asserted that it had
found "a subheading that more directly relates to the input in
question," and that its new, chosen subheading was "specific to the
input in question (i.e., covers plastic ornamental articles) and is
contemporaneous with the POI."   Remand Results 40.   Commerce
further noted that "there is a close overlap in the description of
the HTS subheading selected, 3926.4099, and the HTS subheading
proposed by Dorbest, 3926.4009, in that both appear to include

_____

[18]3926.4099, HTS[I] includes: other articles of plastics:
other statuette & other ornamental articles NES.

[19]The court recognizes that this decision nearly tripled the
valuation of resin applique used by Commerce.

plastic ornamental articles." Id.

Dorbest challenges Commerce's determination on remand. Although Dorbest agrees with the determination that the input was ornamental, Dorbest Comments on Remand Results 38, Dorbest argues that Commerce continues to reject 3926.4009, HTS[I] solely on the basis that it predates the period of review, and that this is not in accordance with the court's instructions. Id. (quoting Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1310 ("the use of contemporaneity as the sole justification for its decision does not comport with Commerce's statements that contemporaneity is but one of several criteria when selecting surrogate value information.")).   Dorbest further argues that Commerce improperly reopened the record on remand when it chose a subheading - 3926.4099 - that was not proffered by any party in the proceeding below. Dorbest Comments on Remand Results 40.   Dorbest argues that import statistics related to the subheading and considered by Commerce on remand were not part of the record during the administrative proceeding and should therefore not have been examined during the remand redetermination. Dorbest further argues that it was prejudiced by the short amount of time it had to respond to Commerce's choice of a new subheading, stating that three weeks was simply not sufficient, particularly when compared to the length of the initial investigation.   Despite the short amount of time, Dorbest raised a number of concerns with subheading 3926.4099, HTS[I] before Commerce.

Dorbest's argument characterizes the court's decision as
"overrul[ing] Commerce's reliance on contemporaneity as the sole
basis for rejecting the value proposed by Dorbest." Dorbest
Comments on Remand Results 46.  This statement claims too much.
The court's remand order states that "[w]hile the court agrees that
contemporaneity is an important factor to consider when evaluating
surrogate value information, the use of contemporaneity as the sole
justification for its decision does not comport with Commerce's
statements that contemporaneity is but one of several criteria when
selecting surrogate value information." Dorbest, 30 CIT at_, 462 F.
Supp. 2d at 1310 (citations omitted).  The court further criticized
Commerce's determination for not explaining or analyzing how its
chosen subheading reflected Dorbest's description of the factor
input.  However, the court did not, as implied by Dorbest, set any
specific standard for Commerce to meet in order to reject Dorbest's
suggested subheading.

Although the court rejected Commerce's choice of a subheading
when the sole justification for that choice was Commerce's
preference for contemporaneous data, on remand, Commerce made its
choice based on Dorbest's description of its input, the overlap of
its chosen subheading with Dorbest's proposed subheading, and the
subheading's status as un-expired.  Contemporaneity cannot
therefore be said to be "the sole justification for [Commerce's]
decision" on remand. Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1310.

Rather, Commerce appears to have properly exercised the "wide discretion" accorded to it by Congress "in the valuation of factors of production" pursuant to 19 U.S.C. § 1677b. <u>Nation Ford Chem. Co. v. United States</u>, 166 F.3d 1373, 1377 (Fed. Cir. 1999). Nothing in this court's order limited Commerce to a choice between the two subheadings examined during the initial investigation. Further, as Commerce noted in its remand determination, "[Dorbest] has not argued that the [subheading chosen by Commerce] is not specific to the input in question." <u>Remand Results</u> 46.   Thus, Dorbest did not dispute the accuracy of the subheading, although it did advance several arguments as to why data regarding the subheading was distorted or inacurate.

Specifically with regard to the subheading data, on remand, Dorbest argued that data from InfoDrive India indicated that the subheading Commerce chose included mis-classified product. <u>Dorbest Comments on Remand Results</u> 44. Dorbest submitted data from InfoDrive India during the Remand proceedings "to illuminate the contents of HTS 3926.4099." <u>Id.</u> at 44 (quoting Dorbest's Comments on Draft Remand Redetermination (Apr. 5, 2007)(2d Remand Pub. Doc. 21 at 26-29 & Exh. 12)). Specifically, Dorbest claims that the data show inclusion in 3926.4099, HTS[I] of numerous items that should be classified in other categories, including plastic pellet samples (boxes), plastic beads, resin clocks, figures (made of polyresin) and photo frames. <u>See Dorbest Comments on Remand Results</u>

44-45.  Dorbest states that "[i]f Commerce's new [chosen subheading] underwent the same scrutiny ensured by the procedural safeguards of the full proceeding below . . . additional information could have been developed to illuminate the problems in this [subheading]." Id. at 45.

Regarding the problems Dorbest "illuminated" during the remand proceeding, Commerce found that the Infodrive data Dorbest put forth "cannot be relied upon because they fail to account for a significant percentage of imports reported under the HTS subheading and because the data are not reported in a uniform, measurable quantity." Remand Results 47.  Commerce noted that the Infodrive data excluded data from several countries which "represent 54 percent of total imports, by quantity, excluding imports from the PRC, Thailand, and South Korea." Id. at 48 (citing Dorbest's Comments on Draft Remand Redetermination (Apr. 5, 2007)(2d Remand Pub. Doc. 21 at Exh. 12)).  Commerce also found that imports for all but two countries listed were incomplete. Remand Results 48. Commerce also argued that Infodrive data was not reliable because of the multiple units of measurement under which the Infodrive data is classified. Id.  These problems with the data, according to Commerce, differentiated the situation of resin from that of mirrors, see infra at 27-29.  Commerce therefore reasonably determined that the Infodrive data was not reliable enough to call into question the MSFTI data.

Nor is Dorbest's argument that three weeks was an insufficient amount of time for it to properly comment on the draft redetermination persuasive.  As Defendant notes, remand determinations typically involve "a limited number of issues . . . as compared with a full antidumping investigation." Def.'s Resp. to Comments upon Commerce's Redetermination Pursuant to Remand 58 ("Def.'s Resp. to Comments on Remand Results").  Although Dorbest states that it did not have sufficient time, it does not allege specific prejudice from having such a short time to comment.  Nor, as the AFMC notes, did Dorbest request an extension of time during the remand proceedings.  AFMC's Rebuttal Comments on Remand Results 45.  Dorbest admits that the objections it raised to Commerce's choice of subheading 3926.4099 were "not 'foolproof' to Commerce's counterattack." Dorbest Comments on Remand Results 43, and does not suggest that, since the remand proceeding, it has come up with other objections which it was unable to exhaust before the agency due to a lack of time.  However, Commerce addressed this argument below, and found that there was no reason to exclude those values.

Lastly, Dorbest argues that if the court affirms Commerce's choice of subheading, Commerce should still be required to exclude aberrational data from the United States and Singapore. Id. at 47.  Dorbest bases its assertion of distortion on the fact that goods from each of these countries were only imported during one month of the POI, and because the values were higher than imports from other

countries.  Id. (citing Hebei Metals & Minerals Imp. & Exp. Corp.
v. United States, 28 CIT 1185 (2004)).  Commerce addressed this
issue during the remand proceedings, and made a factual finding
that the values were not distortive, because "the average unit
value from the United States and Singapore are 3.1 and 4.2 times
the average unit value from all other countries, respectively," and
because the volume of imports from the two countries was relatively
large, notwithstanding the fact that imports were made during only
one month. Remand Results 49 (contrasting the situation with that
in Hebei, where values were 8.5 times the average value, and the
aberrational imports were in small quantities).  On this record,
Commerce's determination cannot be said to have been unreasonable,
as Commerce weighed the evidence and chose between imperfect
alternatives.  For the reasons explained above, the court finds
that Commerce's valuation of the resin applique input is
reasonable.


C. Mirrors

     In its Final Results, Commerce used MSFTI data to value mirror
inputs, claiming it to be the best available information.  Dorbest
challenged the choice of data, arguing that the MSFTI data for the
relevant subheading, 7009.9100, was distorted by its inclusion of
specialty mirrors from Taiwan.  The court found that Commerce's
determination that the MSFTI data was the best available

information was not supported by substantial evidence.  The court remanded the issue to Commerce with instructions to evaluate the inaccuracies of the MSFTI data set, which it had not previously done.  Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1280 (noting that "[i]nstead of addressing the Respondents' concerns with the MSFTI data, Commerce chose to attack the quality of the data proffered by Respondents, claiming that the unreliability of the data negated its ability to serve even as a means of evaluating the MSFTI data.").  The court also instructed Commerce to evaluate the Glass Yug data,[20] stating that "[a]t the very least, none of Commerce's arguments with respect to Glass Yug address why this data should not be viewed as probative towards a view that Commerce's chosen valuation is too high and/or inaccurate."  Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1282.

On remand, Commerce determined that specialty mirrors from Taiwan were included in the MSFTI data and likely produced distortion in that data.[21]  Remand Results 51-52.  Commerce further

---

[20]Glass Yug is a publicly available, quarterly, Indian glass publication that reports on the flat glass industry.  Remand Results 54.

[21]Specifically, Commerce found that "all of the imports within the mirrors HTS category from Taiwan into India" were made by "an automotive parts company that sells, among other things, rearview mirrors" that would not be used by Indian producers of wooden bedroom furniture. Remand Results 51-52.  Commerce further found that this import data "represent 100 percent of imports of the mirrors HTS category from Taiwan into India and the Taiwanese data represent 80.74 percent of the total imports under this HTS
                                                      (continued...)

determined that excluding Taiwanese data from the MSFTI data would not remedy the dataset. <u>Id.</u> at 52-53. This determination was based in part on the fact that a large portion of the MSFTI data consisted of the Taiwanese data. Commerce also noted that automotive parts made up at least a portion of the data from other countries, and that these data were misclassified. <u>Id.</u> at 53. As a result, Commerce felt it could not "presume with any degree of certainty that the remaining imports within this category are not similarly misclassified." <u>Id.</u>

Commerce then determined that this Glass Yug data represented the best available information. Commerce found that the two companies whose prices were reported therein were "large Indian producers that are significant players in the Indian mirror marketplace", and that their price information was "reasonably representative of the cost of mirrors in India." <u>Remand Results</u> 56. Commerce further found that the data were contemporaneous, <u>id.</u>, specific to the product described by Dorbest, <u>id.</u>, likely to have excluded taxes, <u>id.</u> at 57, and corroborated by other sources on the record. <u>Id.</u> In its determination, Commerce rejected Petitioners' arguments that the Glass Yug data are "not contemporaneous, not country-wide, not representative and that the prices are distortive of the market for mirrors in India." <u>Id.</u> at

---

[21](...continued)
category." <u>Id.</u> at 52.

64.  No party objects to this determination, and the court finds
that it is reasonable.


D. Cardboard

    In its Final Results, Commerce valued Dorbest's packing
cardboard factor of production under subheading 4808.1000, HTS[I].[22]
Issues & Decision Mem., at 170 (Cmt. 19) P.R. Doc. 1933.  Dorbest
challenged the results, based on an argument that subheading
4808.9000, HTS[I][23] was more appropriate to its cardboard, which
Dorbest claimed was not perforated.  This led Commerce to issue an
Amended Final Determination, using subheading 4808.9000 to value
the cardboard input.  Amended Final Determination and accompanying
Issues & Decision Mem. (Cmt. 5).

    Before the court, AFMC argued that the original classification
of 4808.1000, HTS[I] was more appropriate, alleging that Dorbest's
packing cardboard was corrugated, and that therefore subheading
4808.1000 was specific to the input, and further arguing that the
phrase "perforated or not" made the question of perforation
irrelevant to valuation.  Petitioner's Br. 22-23.

    The court explained that "[l]ogic would dictate that the use
of the word 'other' in the basket subheading indicates that this

_____

    [22]4808.1000, HTS[I] includes: corrugated paper and
paperboard, whether or not perforated.

    [23]4808.9000, HTS[I] includes: other paper and paperboard
corrugated.

subheading should only be used if all other subheadings within that heading are exhausted and have been deemed inappropriate." Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1313. The court further explained that under well-established classification principles, "it is only appropriate to use a basket provision when no other subheading applies." Id. (citing Witex, U.S.A., Inc. v. United States, 28 CIT 1907, 1916-17 & n. 16, 353 F. Supp. 2d 1310, 1319 & n. 16 (2004)). In its discussion, the court noted that nonetheless, there was a difference between Customs classifications and the issue here, stating that "Commerce's goal here is different from Customs'. Whereas in Customs cases determining the proper specific classification is paramount . . . in Commerce cases, Commerce is using the HTS[I] merely to approximate the cost of a factor of production . . . ." Dorbest 30 CIT at_, 462 F. Supp. 2d at 1308 (citations omitted).

After concluding that, in subheading 4808.1000, "whether" likely meant "whether or not," and that perforation was therefore probably not dispositive to a classification determination, the court found that Commerce's decision was not supported by substantial evidence. Dorbest 30 CIT at_, 462 F. Supp. 2d at 1313. Dorbest's cardboard input valuation was therefore remanded to the agency, with the order to "either explain, with reference to the description of the input, why 4808.9000 is the appropriate classification, or to change the classification accordingly."

Dorbest, 30 CIT at __, 462 F. Supp. 2d at 1313.

Upon remand, Commerce again found that subheading 4808.9000 was appropriate for valuing the import. Remand Results 90. Commerce agreed that "whether or not perforated" did not exclude either perforated or non-perforated cardboard from subheading 4808.1000. Id. However, Commerce still found that the perforation language distinguished the two categories, stating that the language allows for the inclusion of perforated cardboard in subheading 4808.1000, while perforated cardboard would rarely be included in subheading 4808.9000. This second observation, that perforated cardboard would not be included in basket provision 4808.9000, was based on Commerce's determination that perforated cardboard would more likely be classified under 4808.1000, as that subject heading specifically mentioned perforated cardboard.[24] Id. at 91. Thus, Commerce chose to use the basket classification "in an attempt to eliminate any distortions that may potentially be caused by valuing Dorbest's non-perforated packing cardboard using an HTS subheading that likely includes perforated paperboard." Id.

In response to comments from the parties during the remand

_____

[24]Apparently, Commerce did not consider that the exact same argument as to why perforated cardboard likely would be classified under 4808.1000 also applies, mutatis mutandis, to non-perforated cardboard. Namely, that 4808.1000 specifically mentions non-perforated cardboard, and thus any cardboard that fits both subheadings should not be classified under 4808.9000, because 4808.1000 specifically mentions its non-perforated characteristic.

proceedings, including Dorbest's argument that other entries under 4808.1000 would be distortive of the input cost, Commerce further stated that "when valuing factors of production for Dorbest, it is not <u>classifying</u> Dorbest's corrugated packing cardboard within either of these subcategories. Rather . . . it is evaluating which HTS subcategory better reflects Dorbest's packing cardboard input." <u>Remand Results</u> 94 (emphasis added). Although Dorbest cited Infodrive data to support its argument that 4808.9000 was the most appropriate valuation for its input,[25] <u>Remand Results</u> 93, Commerce appears not to have relied on this data. <u>Id.</u> at 94-95. Although Commerce defends its decision by arguing that it chose the subheading that "better reflects" the input, it appears to the court that Commerce's justifications for the decision are only related to analysis of the classification. This issue is therefore unlike the mirror inputs, discussed above, in which Commerce made a factual finding that certain inclusions in the appropriate subheading caused distortion. <u>See</u> <u>supra</u> at 28-31. Rather, here Commerce did not make a finding, as would have been proper, as to whether perforated cardboard items classified under subheading 4808.1000 were distortive to its valuation.

---

[25]Specifically, Dorbest cited Infodrive data for subheading 4808.1000 to show that "none of the imports under this subheading match Dorbest's cardboard as the subheading consists of 'corrugated box' (i.e., finished boxes, not cardboard) and 'Ikea Blister Outer' (which is unlike Dorbest's plain cardboard)." <u>Remand Results</u> 93 (citing Dorbest's Rebuttal Comments to the Department (April 10, 2007)).

Commerce has now requested a voluntary remand "in order to permit Commerce to consider whether <u>any</u> cardboard would likely be present in the 9000 basket subheading given that all cardboard would likely be placed in the more specific 1000 subheading." <u>Def.'s Resp. to Comments on Remand Results</u> 71 (emphasis added). Commerce suggests that remand is "particularly appropriate because, for the first time, in AFMC's June 29, 2007 comments brief, petitioners argued that the proper title of the 9000 basket subheading is 'other' rather than 'other paper and paperboard corrugated.'" <u>Id.</u> Commerce therefore requests a remand "to determine the actual title of the subheading and determine the correct HTS subheading to employ for the valuation of cardboard." <u>Id.</u> at 72.

Dorbest opposes remand, arguing that numerous documents on the record show that subheading 4808.9000 is unquestionably "other paper and paperboard corrugated," and that AFMC has just now begun to mis-characterize it as "other." Rebuttal Comments of Pls. Dorbest on Remand Redetermination 6-11 ("<u>Dorbest Rebuttal Comments</u>").[26]  Dorbest further argues that Commerce applied

---

[26]Dorbest notes that the HTS[I], used in this review, may have differed from the American HTSUS, and points to multiple places in the record before Commerce during its initial and amended determinations, as well as remand, that show the subheading according to HTS[I].  These include MSFTI statistics in the World Trade Atlas Commerce used in valuing all inputs in this investigation, Dorbest's submission, Shing Mark's submitted printouts from InfoDrive India, and Tech Lane's submission. <u>Dorbest Rebuttal Comments</u> 7-8 (all quoting subheading 4808.9000 as "other paper and paperboard, corrugated.").  Dorbest also
(continued...)

subheading 4808.9000 to all other respondents in this case, and that it is unfair to Dorbest for Commerce to use a different rate.

The court understands, as put forth by Defendants, that "[a]n agency may request a remand to reconsider its previous position without confessing error." Def.'s Resp. to Comments on Remand Results 71 (quoting SKF USA Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001). However, it is difficult to fathom how a failure to ascertain the meaning of the subheadings at issue on three separate occasions[27] could be characterized as anything but error. Nonetheless, the court will grant Commerce's request for another remand, particularly as it appears that Commerce has yet to follow this court's instructions to "explain . . . why 4808.9000 is the appropriate classification, or to change the classification," Dorbest, 30 CIT at __, 462 F. Supp. 2d at 1313, due to the logical inconsistencies in Commerce's proffered "explanation." See, e.g., supra, n. 24. Upon remand, Commerce shall determine under which subheading Dorbest's input would properly be classified, and further determine whether the data put forth by Dorbest regarding distortion to data in subheading 4808.1000 necessitates alteration of the data used or the selection of a different subheading.

---

[26](...continued)
notes that AFMC submitted information that was consistent with this description.

[27]The Final Results, Amended Final Results, and Redetermination Pursuant to Remand.

E. Metal Spare Parts, Non-Scope Metal Canopies and Certain Raw
Materials Expenses

Commerce requested a voluntary remand on the issue of its
treatment of spare parts, elimination of metal parts and canopies
and valuation of incoming raw material expenses after "realizing
that certain elements of Dorbest's margin calculation were made in
error." Remand Results 95. The court granted Commerce's request.
Upon remand, Commerce made certain changes to these factors,
altering Dorbest's resulting margin calculation. Dorbest concurred
with Commerce's resolution of these issues, and the Petitioners did
not comment on them, either below or before the court. Therefore,
the court will accept without review Commerce's remand decision.

3. Selection of surrogate companies to calculate financial ratios

A firm's "general expenses and profits" not traceable to a
specific product are also considered factors of production for
purposes of calculating normal value. These expenses and profits
include (1) factory overhead ("overhead"), (2) selling, general and
administrative expenses ("SG&A"), and (3) profit. 19 U.S.C. §
1677b(c)(1); see also Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1300.
In order to attribute the appropriate amount of expenses and
profits to the merchandise in question, Commerce uses a ratio that
describes the relationship between expenses and profits and a

Consolidated Ct. No. 05-00003                                    Page 38

firm's overall manufacturing cost.[28]   These calculations are

performed with data from financial statements of one or more

_____

[28]In its original opinion, the court described the system of
calculating financial ratios in detail.  That explanation is
reproduced here:

> These values are calculated as follows.  Factory
> overhead includes such costs as the cost of machinery,
> spare parts, and rent.  Commerce adds together all such
> costs, as expressed on a surrogate company's financial
> statement, to get the total overhead expenditure
> ("Overhead$_s$"); Commerce then divides the result by the
> surrogate firm's material, labor, and energy costs
> ("MLE$_s$"). . . .  Finally, Commerce multiplies the
> result by the derived manufacturing cost of the product
> in question of the investigated firm ("MLE$_p$").  The
> result is the overhead that may be allocated to the
> normal value of the merchandise in question
> ("Overhead$_p$").  Stated mathematically:

$$\frac{Overhead_s}{MLE_s} * MLE_p = Overhead_p$$

> Next, Commerce adds the surrogate firm's MLE and
> Overhead (together "the cost of manufacturing") and
> determines an amount for general expenses ("SG&A$_s$")
> including, for example, expenses such as bank charges,
> travel expenses, and office supplies. . . .  Commerce
> then calculates the ratios of the surrogate firms' SG&A
> to its cost of manufacturing and multiplies this ratio by
> the sum of MLE$_p$ and Overhead$_p$; the result is the SG&A
> that may be allocated to the merchandise in question
> ("SG&A$_p$").  Stated mathematically:

$$\frac{SG\&A_s}{MLE_s + Overhead_s} * (MLE_p + Overhead_p) = SG\&A_p$$

> Last, Commerce adds an amount for profit.  Commerce
> initially calculates the surrogate company's profit
> ratio which is the ratio of the surrogate company's
> before-tax profit ("profit$_s$") over the sum of MLE$_s$,
> Overhead$_s$, and SG&A$_s$. . . .  Commerce then multiplies
> this result by the investigated company's derived MLE$_p$,
> Overhead$_p$, and SG&A$_p$.  The result is the profit that may
> be allocated to the merchandise in question ("profit$_p$").
> Stated mathematically:

$$\frac{profit_s}{MLE_s + Overhead_s + SG\&A_s} * (MLE_p + Overhead_p + SG\&A_p) = profit_p$$

<u>Dorbest</u>, 30 CIT at_, 462 F. Supp. 2d 1301, n. 36 (citations
omitted).

surrogate companies.

In its Final Results, Commerce used the financial statements of nine companies to calculate financial ratios. Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1302. The parties challenged various of Commerce's determinations as to which companies to include and which to exclude. The court remanded to Commerce its determinations concerning the inclusion of data from Jayaraja and Evergreen upon AFMC's challenge, and also remanded Commerce's determination to include data from Swaran, Nizamuddin, Fusion Design, and DnD upon Dorbest's challenge to those data.

Jayaraja and Evergreen

In remanding Commerce's determination to include data from Jayaraja, the court ordered Commerce to address AFMC's objections on remand, noting that "[d]espite the fact that Commerce outlined AFMC's arguments in the Issues & Decision Mem. . . . the Final [Results] does not directly or indirectly refute these arguments . . . ." Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1304 (citations omitted). Specifically, the court ordered Commerce to address AFMC's contention that Commerce, in using Jayaraja's financial statement, had departed from its "well-established practice to reject" financial statements that contain "no notes" and "no auditor's statement." See Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1303. The court noted that Commerce had also not addressed AFMC's alternative argument that Jayaraja's statement was "a significant

outlier and a cause of distortion" because "[Jayaraja] report[s] zero depreciation in the profit and loss statement." See id. at 1303-04. The court went on to state that "[a]lthough Commerce's argument [that Jayaraja's financial statement was approved by an auditor and was sufficiently detailed such that no auditor's statement or notes were necessary] may be compelling, the agency must adopt this position on the agency record if the court is to affirm it here." Id.

In remanding Commerce's determination to include financial statements from Evergreen, the court found that Commerce had not justified its decision "to include statements which it admits are of questionable reliability and thereby unlikely to constitute the best available information." Id. at 1304. Specifically, Commerce had not addressed AFMC's concerns that Evergreen's status as a "significant producer of leather garments as well [as] a manufacturer of furniture," id. (quoting AFMC's Br. 24), would lead to distortions in Commerce's calculation of Evergreen's financial ratio. In the Final Results, Commerce had excluded "identifiable manufacturing expenses related to the production of leather goods from the MLE denominator," because of its finding that "Evergreen outsources almost the entire production of its leather goods." Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1304 (quoting Memorandum from Jon Freed, Case Analyst, to File Re: Final Determination Financial Ratio Memorandum: Wooden Bedroom Furniture from the

<u>People's Republic of China</u>, P.R. Doc. 1931 at 2).  However,
Commerce had "conceded that Evergreen's leather production was more
problematic in the calculation of the other ratios," because its
"SG&A and profit relate to both leather and furniture goods." <u>Id.</u>
(citations to record omitted).  Nonetheless, "Commerce included
leather related expenses in the denominator of the SG&A and profit
ratios." <u>Id.</u>  The court found that Commerce had not explained "why
the inclusion of Evergreen's financial statement, in spite of the
complication identified by Commerce, adds to the accuracy of its
calculation of the surrogate ratios." <u>Id.</u>  The court went on to
explain that "[p]articularly problematic is the fact that other
financial statements, without such problems, exist." <u>Id.</u>

    On remand, Commerce made a determination to exclude financial
statements from Evergreen and Jayaraja.   <u>Remand Results</u> 72.  In
determining not to use Jayaraja data, Commerce found that "due to
the lack of the auditor's report, schedules, the auditor's opinions
and notes to the financial statement," there was not sufficient
data to "allocate Jayaraja's expenses among direct expenses,
overhead, and SG&A with any level of certainty." <u>Id.</u> at 73.
Commerce explained that "the Jayaraja statements do not report an
amount for depreciation," and that therefore Commerce had "no means
to conclusively determine if Jayaraja had any depreciation expenses
during the period." <u>Id.</u> at 73-74.  Commerce further noted that this
decision "is consistent with [Commerce's] practice to normally

disregard surrogate financial statements if they are incomplete and lack certain key reports (e.g., schedules, notes)." Id. at 74 (citing Silicomanganese from Kazakhstan, 67 Fed. Reg. 15,535 (Dep't Commerce Apr. 2, 2002)(determination of sales at less than fair value)).  In determining not to use Evergreen data, Commerce took into account the issue of disaggregation of profits and SG&A expenses, and determined that "[u]pon further consideration of this issue, we find that sufficient evidence does not exist for a finding that the profit margin for producing and selling leather garments is the same as that for producing and selling furniture." Remand Results 72.

Dorbest argues that although Commerce stated concern regarding distortion resulting from the use of Evergreen's data, it did not identify the nature of the distortions. Dorbest Comments on Remand Results 29.  Dorbest points to Fuyao Glass Industries for the proposition that "a company's SG&A supports its entire operations, including both self-production and outsourced merchandise." Dorbest Comments on Remand Results 31 (citing Fuyao Glass Indus. Group Co. v. United States, 2005 Ct. Int'l Trade LEXIS 29, 56-57 (CIT Jan. 25, 2005).  However, the issue in that case was that expenses related to the purchase of traded goods were reflected in the numerator, but not the denominator, of the ratio.  Fuyao Glass Indus. Group Co., 2005 Ct. Int'l Trade LEXIS at 56-57.  The court noted that there were numerous ways to correct this problem, and

once Commerce had included those expenses in the denominator, the
court found Commerce's methodology to be supported by substantial
evidence. Dorbest also cites Tapered Roller Bearings, arguing that
if there is distortion, Commerce should be able to correct for it,
rather than eliminating the data. Dorbest Comments on Remand
Results 31 (citing Tapered Roller Bearings and Parts Thereof,
Finished and Unfinished, from the People's Republic of China, 71
Fed. Reg. 75,936 (Dep't Commerce Dec. 19, 2006)(final results of
2004-2005 administrative review and partial rescission of review)).
Dorbest points out that in the Final Results in this case, Commerce
also included the leather manufacturing data in the denominator of
the SG&A and profit ratios. However, neither in Fuyao nor in
Tapered Roller Bearings was the issue raised, as it has been here,
that the products being included would have a different profit
margin, based on their differences from the subject merchandise.
In Fuyao, the court found that Commerce's calculation had resulted
in an "apples to apples" comparison. Similarly, to achieve such a
results here, Commerce reasonably chose to exclude Evergreen so as
not to make a furniture-to-leather-goods comparison. Commerce
could not find evidence to show that the profit margins of leather
goods and wooden furniture would be similar, and as such determined
that the inclusion of the data - even if included in both the
numerator and the denominator - could likely be distortive. Where
other data without these drawbacks existed, Commerce's

determination to exclude data from Evergreen is supported by substantial evidence.

Regarding Jayaraja, Dorbest notes that Commerce's assertions on remand "are the polar opposite of those made in [sic] previously to the Court in justifying use of Jayaraja [data]." Dorbest Comments on Remand Results 34. Dorbest further argued that IFP similarly did not have an auditor's report, speculating that Commerce had simply chosen to dispose of the smaller of the two numbers. Id. at 36. However, the court finds that Commerce followed its practice by choosing not to use incomplete information that lacked an auditor's report, and its determination was supported by substantial evidence where Commerce pointed to specific data that it was missing, such as depreciation data, and explained the significance of that data. Because the inclusion of IFP was not challenged here, the court will not now address this issue.

The court also remanded Commerce's determination to use data from financial statements from Swaran, Nizamuddin, Fusion Design and DnD in its calculation of financial ratios. The court noted that Respondents' concerns that the smaller size of these companies would lead to inclusion of unrepresentative data appeared to be relevant, given that these four companies "had an average SG&A ratio of 32.22% compared with the 14.37% average SG&A rate of the other allegedly similar five companies included in the data set."

Dorbest, 30 CIT at __, 462 F. Supp. 2d at 1306.  Though Commerce

justified its conclusion by pointing to the SG&A ratios of Jayaraja

and Akriti to show that small production and sales volumes did not

always correlate with high SG&A expenses, the court found that this

observation did "not demonstrate the opposite conclusion: that the

size of Nizamuddin, Fusion Design, Swaran, and DnD are irrelevant."

Id.  The court further explained that "where, as here, there are

(perhaps) other surrogate companies which better approximate the

manufacturing  experience  of  the  importers'  businesses,  the

comparability  test  may  require  limiting  the  data  set  to  those

surrogate  companies  which  reasonably  approximate  the  importers'

manufacturing experience . . . ."  Id. at 1307.  On remand, the

court  ordered  Commerce  to  explain  its  inclusion  of  these  four

companies' statements, noting that "Commerce is free on remand to

find  that  these  financial  statements  are  as  reflective  of  the

Respondents'  manufacturing  experiences  as  the  other  financial

statements upon which it relies," but adding that "Commerce must

uniformly apply whatever criterion it ultimately adopts." Id.

On remand, Commerce again chose to use financial statements

from Swaran, Nizamuddin, Fusion Design and DnD. Remand Results at

68-69.[29]   Commerce found that "none of the seven Indian companies

---

[29]Commerce first found that all the companies produced
wooden furniture, and that the furniture need not be specifically
for a bedroom in order to provide relevant data.  This
determination was not challenged by either party here.

used in [Commerce's] calculation of the surrogate financial ratios approximates the size of Dorbest," and that the revenues of all but one of the companies were under $1 million, with revenues of all the companies significantly less than that of Dorbest. <u>Remand Results</u> 69-70. As a result of all the surrogate companies being smaller than Dorbest, Commerce did not find "that their relative size in relation to Dorbest is a basis for the inclusion or rejection of a financial statement." <u>Id.</u> at 70. Commerce further found "no evidence that relative size is a primary driver in the differences in financial ratios of the Indian surrogate companies on the record." <u>Id.</u> Commerce based this conclusion on the fact that the largest of the surrogate companies, Indian Furniture Products ("IFP") "represents the mid-point of the calculated SG&A ratios," and that "if relative size drove the SG&A ratio," the largest company "would be expected to have the lowest SG&A ratio . . . ." <u>Id.</u> (citations omitted).[30] Commerce also found that Swaran's high SG&A ratio skewed the average ratio for the four companies, and that exclusion of Swaran's data would result in comparable ratios to those of the other companies. <u>Id.</u> at 71. Commerce went

---

[30]The Petitioners pointed to additional evidence that there is no inverse correlation between the revenues and the financial ratios of companies, as the court recognized there might be. <u>Dorbest</u>, 30 CIT at __, 462 F. Supp. 2d at 1306. Specifically, Petitioners noted that Fusion Design, which was "the smallest company in the group, has the second smallest factory overhead ratio," and that "the sum of the factory overhead and SG&A ratios for IFP is nearly identical to those of two of the smallest companies." <u>Remand Results</u> 80.

on to defend the inclusion of Swaran's data based on "[Commerce's] preference to use multiple financial statements when they are not distortive or otherwise unreliable, in order to eliminate potential distortions that may arise from using those of a single producer." Id. (citing Issues & Decision Mem. (Cmt. 3)).

Dorbest contends that Commerce has "cherry-picked" its data, and that a "clear, dividing line exists between the small versus larger companies, with the smaller companies having a markedly higher SG&A ratio." Dorbest Comments on Remand Results 19. Dorbest further suggests that if none of the surrogate companies is comparable to Dorbest, the court should revisit its decision to affirm Commerce's determination not to use Indonesian data. Lastly, Dorbest suggests that at the least, Commerce should remove Swaran data from its calculation, as it has admitted that this data is distortive.

In support of its argument that Commerce's determination was unreasonable, Dorbest presents its analysis showing that there is a relationship between company size (as measured by cost of manufacture[31]) and SG&A ratio, which is more clearly visible when the data from Evergreen and Jayaraja are present, as they are in the second of the two tables, below, taken from Dorbest's briefing. See Dorbest Comments on Remand Results, 23-25.

---

[31]Commerce's measurements were based on each company's revenue, but a quick review of the data shows that the numbers themselves are comparable in relation to each other.

Table 3: MLE and SG&A% for 7 Companies Used in Remand

| Company | SGA% | MLE |
|---|---|---|
| Fusion Design | 34.39% | 1,491,058 |
| Nizamuddin | 31.51% | 1,970,177 |
| Swaran | 47.30% | 2,350,013 |
| DND | 15.66% | 4,031,745 |
| Akriti | 13.53% | 6,426,611 |
| Raghbir | 10.44% | 28,387,927 |
| IFP | 24.38% | 345,994,333 |

Table 4: MLE and SG&A% for 9 Companies Analyzed in Remand

| Company | SGA% | MLE |
|---|---|---|
| Fusion Design | 34.39% | 1,491,058.00 |
| Nizamuddin | 31.51% | 1,970,177.00 |
| Swaran | 47.30% | 2,350,012.62 |
| DND | 15.66% | 4,031,744.89 |
| Akriti | 13.53% | 6,426,611.39 |
| Jayaraja | 16.61% | 8,080,148.00 |
| Raghbir | 10.44% | 28,387,927.27 |
| IFP | 24.38% | 345,994,333.00 |
| Evergreen | 6.90% | 424,690,459.12 |

It appears to the court that, apart from data from Swaran and IFP (both of which have large values for SG&A compared to the other data points), there is indeed a general, inverse relationship between the size of a company and its SG&A expenses. Furthermore, it appears that Swaran and IFP do not fit this trend. Thus, Commerce's findings, which include comparisons of the two smallest companies' SG&A ratios with IFP's, and which further involved excluding data from Swaran in order to show comparability, while still using the Swaran data in its determinations because of its "preference to use multiple financial statements," do not

adequately address the court's analysis and conclusions in Dorbest.
Indeed, the government states that "Dorbest's graph illustrates
. . . that there is no relationship linear or otherwise, between
its measure of a company's size (i.e., MLE) and its SG&A ratio,
because two of the seven data points – IFP and Swaran – bear no
relationship to the line." Def.'s Resp. to Comments on Remand
Results 49.[32] However, as Swaran's data has been questioned for its
possible distortive effect, it is unclear how its lack of a
relationship to the line can be used in defense of its inclusion.
It appears to the court, therefore, that Commerce's determination–
that there is no relation between company size and SG&A–is
unsupported. Nonetheless, Commerce's determination to include SG&A
ratios which it has determined are "comparable" to those of
companies of other sizes may be within the agency's discretion, if
based on proper findings regarding the effect of including much
smaller companies in its data set. Commerce's remand
determination, however, does not contain such findings.

     Unlike the government's linear extrapolation in its wage rate
analysis, here, Commerce has chosen to use the average data from a
number of companies, none of which are as large as Dorbest. At the

---

[32]The government states in its brief that Dorbest has not
proved a "necessary and linear relationship between product
experience and SG&A." Def.'s Resp. to Comments on Remand Results
46. However, whether the relationship is linear is not
conclusive. If there is a general relationship between the two,
then inclusion of data for much smaller companies, without
further examination, may be distortive.

same time, when determining the best method for finding an accurate wage rate, Commerce examined, but ultimately rejected, simply using an average of all data from comparably-sized entities that satisfied its criteria for inclusion.  See supra at 11-12. Commerce felt that such an action would lead to distorted and overly large wage rate approximations for all companies under a certain size.  Id.  Here, on the other hand, Commerce has determined that the SG&A data are generally comparable, and that their inclusion will not cause a distortion when used to calculate financial ratios for Dorbest.  However, Commerce's determination is based on improperly concluding that there is not a general relationship between company size and SG&A because that conclusion is based on two seemingly aberrational data points, one of which, Swaran, Commerce itself has identified as aberrational.  Given Commerce's ability to create linear regressions and determine variances, this methodology lacks the rigor necessary to support Commerce's conclusion.  Though, as before, Commerce is welcome to find that these four companies' sizes are not relevant to their SG&As, that finding must be supported by substantial evidence, such as calculations and identification of outlier data points.

4. Calculation of financial ratios

    During the original proceedings before the court, Dorbest objected that Commerce had improperly included an amount for "excise duties" in its calculation of the profit surrogate ratio

for IFP and Raghbir, but routinely excluded excise duties from
financial ratio calculations. Mem. of Points & Authorities in
Support of Pls.' & Pl.-Intervenors' R. 56.2 Mot. J. Agency R. 53-
54.[33] The government argued that the Respondents failed to exhaust
their administrative remedies by not sufficiently arguing the issue
before the agency. Def.'s Resp. to Pls.' Surrogate Value Related R.
56.2 Mots. J. Agency R. 99-103. Specifically, the government argued
that although Respondents may have raised the issue of excise
duties during the preliminary investigation, Petitioners did not
thereafter challenge Commerce's preliminary treatment of excise
duties. Id. at 99-100; see also id. at 101 (citing 19 C.F.R. §
351.309(c)(2)(providing that a case brief "must present all
arguments that continue in the submitter's view to be relevant to
the Secretary's final determination or final results, including any
arguments presented before the date of publication of the . . .
preliminary results.")).

     Respondents contend that their primary argument (that Commerce
should use IFP data from 2003/04 instead of 2002/03) would have
mooted the issue of excise taxes, but that they had nevertheless
noted the issue in their reply brief. However, Carpenter
Technology makes it clear that if Respondents "believed that the
. . . issue was relevant to the Final Results" following the

---

[33]Respondents Dorbest and Lacquer Craft Manufacturing
Company, Ltd. filed motions related to these issues together;
however, Lacquer Craft is no longer a party to the proceedings.

adverse decision by Commerce in the Preliminary Results, they "needed to include that issue in [their] case brief, as required by the regulation." Carpenter Technology Corp. v. United States, 30 CIT_,_, 464 F. Supp. 2d 1347, 1349 (2006). As a result of not raising the issue in its case brief, Dorbest "deprived the agency of the opportunity to consider these arguments in the first instance," and further deprived this court of a record to which it could apply its deferential standard of review. Id. As a result, the court is unable to review the issue because of Dorbest's failure to exhaust its administrative remedies.

Also, prior to the court's decision in Dorbest, AFMC argued that Commerce had "failed to treat . . . the salaries . . . as SG&A expenses rather than MLE expenses" for DnD and Evergreen," AFMC's Br. Supp. Mot. J. Agency R. Re: Selection of Surrogate Values & Calculation of Financial Ratios 26 ("AFMC Financial Ratio Br."), and that Commerce failed to similarly categorize certain expenses of certain surrogate companies, id. at 28-29. In Dorbest, the court reserved judgment, allowing the issue to be decided, if necessary, after Commerce issued its redetermination pursuant to remand. Dorbest, 30 CIT at_, 462 F. Supp. 2d at 1302, n. 37. On remand, Commerce did not address the issues "because the Court specifically reserved judgment on these issues, and they are not properly before [Commerce] at present." Remand Results 110. However, as discussed above, Commerce reasonably determined to

exclude data from Evergreen and Jayaraja, thus mooting the issue of
salary and certain other expenses as to those companies. Still at
issue is whether Commerce improperly failed to treat salary as an
SG&A expense for DnD, whether Commerce failed to properly
categorize certain expenses of Fusion Design, Akriti, Raghbir and
IFP, and whether Commerce erred in determining income interest
offsets to SG&A for DnD and Raghbir.

In its Amended Financial Ratio Memorandum, Commerce explained
its treatment of DnD's "Salary & Other Benefit to Staff" as MLE
rather than SG&A expenses. Commerce stated that:

> [t]he financial statement of D'n'D shows that its
> employee-compensation amounts are listed on line-items
> "Wages to Staff" under Schedule H and under "Salary &
> Other Benefit to Staff" found in Schedule J. We did not
> include the line-item "Salary & Other Benefit to Staff"
> as SG&A, however, in order to be consistent with our
> determination to treat employee-related expenses as MLE
> rather than as SG&A.

Mem. from Barbara E. Tillman, Acting Deputy Assistant Secretary for
Import Administration, to Joseph A. Spetrini, Acting Assistant
Secretary for Import Administration, Re: <u>Issues & Decision Mem. For
the Amended Final Determination in the Less-Than-Fair-Value
Investigation of Wooden Bedroom Furniture from the People's
Republic of China</u>, (Dep't of Commerce Dec. 27, 2004) P.R. Doc. 1996
(Cmt. 1). The AFMC challenged Commerce's determination, stating
that DnD had listed all of its manufacturing expenses in Schedule
H, in its subheading "Manufacturing Expenses" and the line items
"Job Work Charges" and "Wages to Staff," and that DnD listed its

other personnel expenses (which should have been treated as SG&A
expenses) in Schedule I, under "Personnel Expenses," showing
certain overhead costs, in addition to the line item "Salary &
Other Benefit to Staff." AFMC Financial Ratio Br. 26-27. AFMC
argues that based on the company's reporting, "'Salary & Other
Benefit to Staff' under Schedule I is the only line where SG&A-
related labor expenses could possibly be listed." Id. at 27-28.

   The government argues that it properly allocated the combined
wages and benefits reported by DnD as MLE, and that the wages AFMC
argues should be classified as SG&A also "include benefits that are
properly allocated in MLE." Def.'s Resp. Pls.' Surrogate Value
Related R. 56.2 Mots. J. Agency R. 88-89 ("Def.'s Surrogate Value
Resp."). The government further explained that "Indian companies
commonly classify all labor-related benefits, such as pensions or
medical benefits, as general or administrative expenses. Such
classification as 'administrative' by the surrogate company does
not imply that the benefits are only paid to non-manufacturing
employees. Rather, such classification merely implies that the
Indian company considers the benefits to be administrative or
general in nature." id. at 89-90. In such cases, where there is
only one line-item for the labor-related benefits, Commerce
classifies the entire amount as manufacturing labor costs, or MLE.
This, argues the government, was the appropriate action for
Commerce here, where DnD's statements "lumped all employee-related

benefits with the non-manufacturing labor;" Commerce therefore
included all of the "salaries and other benefits" under MLE. Id. at
90.  The dispute is therefore over Commerce's interpretation of
DnD's financial statements.  Commerce determined that all employee-
related benefits were included in "Salary & Other Benefit to
Staff," line-item, because there appeared to be no separate
benefits line-item for administrative staff.  AFMC, however, argues
that the organization of the information reported by DnD indicates
that "Personnel Expenses" would contain benefits for administrative
staff.    However,  AFMC  does  not  explain  how  Commerce's
interpretation of the reported data is unreasonable.  Certainly,
AFMC presents a possible interpretation; however, it is not for the
court  to  decide  between  two,  equally  plausible  factual
interpretations.  As such, the court cannot find unreasonable
Commerce's determination that DnD does not separately report
benefits to its administrative staff, and that it will therefore
follow its practice to classify the entire amount as MLE.

AFMC further argued that Commerce did not categorize the
expenses of manufacturing and non-manufacturing employees as MLE
expenses and SG&A expenses, respectively, for Fusion Design,
Akriti, Raghbir and IFP.  Although AFMC acknowledges that these
companies'  records  had  intermingled  manufacturing  and  non-
manufacturing labor expenses, AFMC claims that Commerce could have
developed ratios of manufacturing to non-manufacturing labor

expenses based on the other surrogate companies' financial statements and applied those ratios to the labor expenses of these four companies.[34] <u>AFMC Financial Ratio Br.</u> 28-29.  The government notes that AFMC "fails to cite to any legal precedent supporting this assertion." <u>Def.'s Surrogate Value Resp.</u> 90.  AFMC responds that Commerce must segregate the expenses to avoid understating dumping margins. AFMC's Br. Reply to Def.'s & Def.-Intervenor's Resps. Opp. to AFMC Financial Ratio Br. 11.  However, AFMC has not stated a basis in law for its argument that Commerce is required to allocate labor costs between administrative and manufacturing costs, based on the ratios of these costs developed using the data from other companies.  Here, Commerce has chosen an imperfect method (classifying all such costs as manufacturing rather than administrative) where its alternatives are also imperfect.  On this record, the court cannot conclude that Commerce's determination— that allocation of labor expenses is not appropriate where the companies have not separately classified them—is not supported by substantial evidence.

     Also still at issue is AFMC's argument that Commerce erred by offsetting SG&A expenses for DnD and Raghbir with the entire amount of interest income received, regardless of whether such income was short-term or long-term interest income.  During its initial

_____

[34]AFMC included Evergreen in the list of companies with intermingled labor reporting originally; as noted above, however, this issue is moot with respect to Evergreen.

briefing, AFMC argued that Commerce had not followed "its well-established practice, which has been upheld by this Court, to offset SG&A expenses with only short term interest income and foreign exchange gains or losses." AFMC Financial Ratio Br. 30. Rather, according to AFMC, Commerce "improperly offset the SG&A expenses" for DnD and Raghbir "with the entire amount of interest income received, irrespective of whether such income was short-term or long-term interest income." Id. at 31. AFMC further argued that "the record is completely devoid of evidence as to whether the potentially interest bearing assets of these Indian companies bore long- or short-term interest." Id.

In the Issues and Decision Memorandum accompanying its Final Results, Commerce stated that "[w]here applicable, we have [] offset the surrogate companies' SG&A expenses with short-term interest income . . . according to our standard methodology of including these items as offsets to the cost of production." Issues & Decision Mem. P.R. Doc. 1933, 72 (Cmt. 3). In its initial briefing before the court, the government argues that in the case of DnD, "a review of the company's assets identified in its financial statements reveals that the company did not have any non-current interest-bearing assets. All assets listed . . . are classified as 'Current Assets, Loans & Advances.'" Def.'s Surrogate Value Resp. 92. Commerce made the factual determination that the term "current" indicated that the accounts bore short-term

interest, and that there was "no evidence indicating that these items were not current as indicated on the schedule." Id.  The government made the same determination regarding Raghbir's reporting of "current assets."  Id.  However, AFMC contends that Commerce has not followed its longstanding practice, which is "to offset SG&A (interest expenses) with interest revenue only if the financial statement used for the surrogate financial ratios calculation specifically noted that the income was short-term in nature." AFMC Financial Ratio Br. 30.

It appears to the court that Commerce may have made a factual finding that items reported as "current assets" should be regarded as accounts bearing short-term interest, rather than improperly applying a presumption that the accounts were short-term, as argued by AFMC.  AFMC's Br. Reply to Def.'s & Def.-Intervenors' Resps. Opp. to AFMC Financial Ratio Br. 12-13 (arguing that Commerce's practice in this investigation is to employ a presumption that interest income is considered long-term unless there is data on the record indicating that it should be considered short-term). However, the record does not show Commerce's reasoning in making this determination.  In fact, Dorbest joined in Lacquer Craft's brief arguing that AFMC had failed to exhaust its administrative remedies with respect to this argument, thus leaving an insufficient record on which this court can examine Commerce's reasoning. Resp. Lacquer Craft et al. to AFMC's Mot. J. Agency R.

29.  AFMC responded by arguing that this issue falls into the exception for issues that were first addressed by Commerce in its final determination. AFMC's Br. Reply to Def.'s & Def.-Intervenors' Resps. Opp. to AFMC Financial Ratio Br. 14, n. 12 (stating that "Commerce did not calculate financial ratios for [DnD] until the final determination, and the AFMC did not have an opportunity to raise [this issue] until this appeal," and that "Commerce did not independently calculate ratios for Raghbir in the preliminary determination, relying instead on on Lung Dong . . . . Lung Dong's calculation, however, did not include an offset."); see also Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 28 CIT 1185, 1196 (2004)(noting an exception to the exhaustion doctrine "where the respondent did not have the opportunity to raise the relevant issue at the administrative level." (citations omitted)).

Because Commerce did not have the opportunity to explain its reasoning during the proceedings, below, consistent with the objective of "allowing the administrative agency to perform the functions within its area of special competence," Hebei Metals, 28 CIT at 1195, the court finds that it would be inappropriate now to rule on whether the determination was supported by substantial evidence.  Accordingly, on remand, Commerce will have the opportunity to explain its reasoning and its factual determinations regarding the offset of SG&A expenses with short-term interest for these two companies.

Finally on this issue, AFMC alleges that certain clerical errors were made with respect to the market economy inputs for rubberwood in Commerce's Amended Final Determination.[35]  AFMC's Comments on Final Results of Redetermination Pursuant to Court Remand 14.  AFMC alerted Commerce to the errors during the remand determination proceedings. Id.  Commerce found that it was not appropriate to correct clerical errors "that have not been specifically remanded by the Court." Remand Results 116.  The government further argues that AFMC raised this issue "two years after the conclusion of the original administrative proceeding, and three months after the Court had remanded the case to Commerce on other unrelated issues." Def.'s Resp. to Comments on Remand Results 72.  The government further argues that AFMC failed to exhaust its administrative remedies by not bringing up the issue, in accordance with Commerce's regulations, "within five days after the earlier of either the date on which Commerce releases its calculation disclosure documents or the date on which Commerce holds its disclosure meeting.  Id. (citing 19 C.F.R. 351.224(c)(2)).  Nevertheless, it is clear that it was within Commerce's discretion to fix these ministerial errors. See, e.g., Hyundai Elecs. Indus. Co. v. United States, 29 CIT _,_, 395 F. Supp. 2d 1231, 1243

---

[35]Dorbest also made allegations of clerical errors during the remand redetermination; however, in opposing AFMC's argument during oral argument before this court, Dorbest clarified its position that at this point in the proceedings, any further adjustments would not be appropriate.

(2005)("Commerce may, with or without a party's request, correct errors that it reasonably regards as ministerial in final determinations." (internal quotations omitted)).  However, <u>Hyundai</u> and the other cases cited by AFMC do not go so far as to <u>require</u> that Commerce <u>must</u> correct late-raised ministerial errors.  This court will not do so here, particularly given the length of time that had elapsed, and the fact that the rubberwood issue was not before Commerce on remand, and thus was not a "live" issue.

## 5. Calculation of Separate/Section A rate[36]

During Commerce's redetermination pursuant to remand, the agency made adjustments to mandatory respondents' rates.  The parties dispute which of those adjustments should apply to redetermination of the separate rate applied to non-mandatory respondents, Art Heritage.  As explained in <u>Dorbest</u>, "[b]ecause of the large number of companies under investigation, pursuant to 19 U.S.C. § 1677f-1(c)(2)(B), Commerce limited its investigation to the seven largest manufacturers of wooden bedroom furniture from the PRC." <u>Dorbest</u>, 30 CIT at _, 462 F. Supp. 2d at 1266.  Commerce used the margins determined for these mandatory respondents to determine a weighted-average "separate rate" margin.[37]

_____

[36]The term "separate rate" is used interchangeably with "section A" rate by the parties in this proceeding.

[37]The government describes Commerce's separate rate calculation as follows:

Commerce weight-averages the antidumping duty margins
(continued...)

The government explained in its response to the court's November 21, 2007 letter that on remand, Commerce made changes to mandatory respondent Dorbest's margin based on challenges Dorbest had successfully brought before the court,[38] and that in addition, "as a consequence of the complaint filed by [AFMC], Commerce recalculated the financial ratios to exclude the financial statements of [Evergreen] and [Jayaraja], and applied this adjustment to Dorbest's margin." Def.'s Response Court's Nov. 21, 2007 Qs 2.  Thus, Commerce made adjustments to Dorbest's margin based on Dorbest's and AFMC's successful challenges to Commerce's

---

[37](...continued)
established for the individually investigated respondents, excluding de minimis margins or rates based entirely on the facts available, and applies this average rate to those companies that, although not individually investigated, have, as a threshold matter, satisfied Commerce that their export activities are not influenced or controlled by the non-market economy entity.
Def.'s Resp. Court's Sept. 12, 2007 Qs at 3 (citing Coalition for the Preservation of American Brake Drum & Rotor Aftermarket Mfrs. v. United States, 23 CIT 88, 110, 44 F. Supp. 2d 229, 251(1999).
Accordingly, this "separate rate" is different from the "PRC-wide" rate applied to companies presumed to be under PRC government control.

[38]The government enumerated the changes made to Dorbests's margin:
(1) adjusted the labor rate; (2) valued resin applique using [HTSI] 3926.4099; (3) valued mirrors using the Indian glass industry publication Glass Yug; (4) eliminated the adjustment to Dorbest's U.S. net price calculation for free-of-charge parts; (5) excluded certain metal parts from Dorbest's margin calculation; and (6) eliminated the deduction of DIRSEL1U from the U.S. price calculation.
Def.'s Response Court's Nov. 21, 2007 Qs 2.

methodology. This redetermination resulted in a revised margin for

Dorbest of 2.87 percent. Id.[39] Commerce also redetermined margins

for the other mandatory respondents, excluding the financial

statements of Evergreen and Jayaraja, based on AFMC's complaint,

which applied to the mandatory respondents and separate rate

companies. Def.'s Resp. to Comments on Remand Results 64. In

applying its results on remand, Commerce determined that "because

the intervening parties were not interveners in Dorbest's lawsuit

. . . they are not entitled to changes that flow from Dorbest's

lawsuit." Remand Results 3, n. 1.[40] Based on this reasoning,

Commerce calculated the separate rate using the recalculated rates

for the mandatory respondents; however, rather than using the 2.87

rate it had calculated upon remand as Dorbest's margin, Commerce

calculated a hypothetical rate for Dorbest for the sole purpose of

---

[39]Dorbest's rate prior to remand was 7.87 percent. Wooden Bedroom Furniture from the People's Republic of China, 70 Fed. Reg. 329, 330 (Dep't Commerce Jan. 4, 2005)(notice of amended final determination of sales at less than fair market value and antidumping duty order).

[40]Art Heritage was plaintiff-intervenor in the case brought by Laquer Craft, which is no longer part of this consolidated action; in the case brought by the AFMC, Art Heritage was defendant-intervenor; Art Heritage did not timely intervene in the case brought by Dorbest. The parties do not dispute that Art Heritage's position in this action is as defendant-intervenor, as they did not timely file to be plaintiff-intervenors. See, e.g., Geum Poong v. United States, 26 CIT 908, 217 F. Supp. 2d 1342 (2002), aff'd, No. 02-1573, 1578 (Fed. Cir. Oct. 2, 2002) (importers sought to intervene in action before the Court of International Trade to reap the benefit of lower "all others rate" calculated by Commerce after remand, but were denied status as intervenors because they had not timely filed).

recalculating the separate rate.  Commerce calculated this rate by

excluding the financial ratios of Evergreen and Jayaraja, but it

did not include any of the adjustments made as a consequence of

Dorbest's challenges before this court.  The government explains

that:

> [w]hen recalculating the final separate rate, Commerce
> took into account only the adjustments that stemmed from
> AFMC's complaint, because AFMC was the only party that
> challenged the separate rate.  Commerce . . .
> recalculated the weighted-average margin for the Section
> A respondents to reflect the change in the financial
> ratios for the mandatory respondents, and did not include
> any Dorbest complaint-based changes in the individual
> rates used to recalculate the separate rate.

Def.'s Resp. Court's Nov. 21, 2007 Qs 3.  Thus, rather than using

the 2.87 percent rate it had calculated for Dorbest, Commerce used

a hypothetical rate of 8.52 percent for Dorbest when calculating a

weighted-average separate rate.  This rate incorporated the

invalidated elements of Dorbest's original 7.87 percent rate, which

Commerce then adjusted as noted above, by excluding the financial

ratios upon which AFMC prevailed.

Art Heritage contends that Commerce improperly recalculated

the separate rate on remand by averaging mandatory respondent rates

that were adjusted upwards on challenges made and won by the AFMC,

but not adjusted downwards for challenges Art Heritage claims were

lost by the AFMC, namely challenges to the labor wage rate and to

the valuation of mirrors.  Resp. of Art Heritage Court's Nov. 21,

2007 Qs 4.  Thus, Art Heritage claims that all the mandatory

respondent rates, and subsequently, the separate rate, must be adjusted to incorporate Commerce's methodology on remand regarding labor wage rate and valuation of mirrors. Id. at 5. Art Heritage bases its argument on AFMC's complaint, which challenged Commerce's calculation of normal value for mandatory respondents. Id. Art Heritage contends that AFMC subsequently lost these challenges, once its lawsuit had been consolidated with the suit brought by Dorbest. In contrast, the AFMC contends that downwards adjustments flowed only from challenges brought by Dorbest, and that therefore those adjustments should only apply to Dorbest. Specifically, AFMC states that "[b]ecause Dorbest's claims concerning the valuation of labor and the valuation of mirrors were not appealed by Art Heritage, any recalculations as a result of Dorbest's claims have no relevance to calculating Art Heritage's margins." Reply of the AFMC to Art Heritage's Resp. to the Court's Nov. 21, 2007 Qs 2.

An examination of the AFMC's Second Amended Complaint, in Court No. 05-0085, shows that the AFMC made a general challenge to Commerce's calculation of normal value, and a number of specific challenges to Commerce's calculation of factors of production, none of which related to the labor wage rate. Second Amended Complaint ¶ 14 ("[Commerce] erred in its calculation of normal value for the mandatory respondents, which . . . reduced the weighted-average margin of dumping applicable to the non-mandatory respondents who qualified for the Section A rate."), and ¶¶ 28-33 (alleging that

Commerce erred by mis-valuing certain raw materials, and by not using adverse facts available).  Art Heritage claims that "[b]y alleging error for all mandatory respondents' calculations of normal value, AFMC is, by definition, challenging the surrogate values for all factors of production []."  Comments on behalf of Art Heritage et al. on Dep't Commerce Final Results of Redetermination on Remand 6 (emphasis omitted)("<u>Art Heritage Comments on Remand Results</u>").  However, neither the complaint nor AFMC's Motion for Judgment on the Agency Record indicate that AFMC brought a challenge to Commerce's wage rate determination or its valuation of mirrors for the mandatory respondents,[41] and, as the AFMC pointed out, consolidation "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." AFMC's Rebuttal Comments on Final Results of Redetermination Pursuant to Court Remand 53 (citing <u>Johnson v. Manhattan Ry. Co.</u>, 289 U.S. 479, 496-97 (1933).  Further, Art Heritage is not entitled to a revised all-others rate for claims brought by Dorbest, as it was not a plaintiff-intervenor in that case.  Thus, Art Heritage's claim that

---

[41]Art Heritage points out that AFMC's brief mentions mirrors as a factor of production, and that this "provides compelling evidence to demonstrate that the AFMC indeed brought the issue of mirrors to the forefront to be decided by the Court." <u>Art Heritage Comments on Remand Results</u> 6.  However, the one sentence claiming that Commerce should have used adverse facts available as to one of the mandatory respondents is not sufficient to sweep the entirety of Dorbest's challenge to mirror valuation into the AFMC's cause of action.

Commerce must recalculate the mandatory respondent rates, taking into account this court's rulings on labor wage rate and mirrors, and subsequently recalculate the separate rate, must fail.

Nonetheless, while it may be correct that Art Heritage is not entitled to have Commerce make adjustments in its favor, Commerce cannot justify creating invalid data for use in its calculations. D & L Supply Co. v. United States, 113 F.3d 1220, 1223 (Fed. Cir. 1997)(deciding under the 1988 version of the antidumping law that "[i]nformation that has conclusively been determined to be inaccurate does not qualify as the 'best information' under any test, and certainly cannot be said to serve the 'basic purpose' [of the statute] of promoting accuracy." ); F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)(affirming Court of International Trade's ruling that Commerce could not use a rate that had been "thoroughly discredited" by Commerce's own investigation). In calculating a rate for Dorbest which was only used in the weighted-average determination of the separate rate, Commerce chose to ignore the more accurate margin it had calculated for Dorbest as a result of this action. The use of this hypothetically constructed rate for Dorbest, which Commerce knew to be invalid, did not constitute the best information available, and is therefore not in accordance with law. See, D & L Supply Co. v. United States, 113 F.3d at 1224. On remand, Commerce need not implement changes flowing as a result of

Dorbest's challenges in calculating new margins for mandatory respondents and separate rate companies that did not timely intervene to protect their rights; however, in calculating the separate rate, it may not use or create invalid data where it has already calculated more accurate data.  To do so is not in accordance with law and therefore cannot be affirmed.

## CONCLUSION

In summary, the court finds as follows:
(i) Commerce's calculation of the labor rate is **affirmed**;
(ii) Commerce's valuation of hooks and connectors, resin applique, and mirrors  is **affirmed**;
(iii) Commerce's valuation of cardboard is **remanded**;
(iv) Commerce's selection of surrogate companies for the computation of the financial ratios is **remanded**;
(v) Commerce's calculation of financial ratios is **remanded** only for Commerce's consideration of interest income; and
(vi) Commerce's calculation of the separate rate is **remanded**.

Remand results are due by April 28, 2008.  Comments are due by May 13, 2008.  Reply comments are due by May 23, 2008.

SO ORDERED.

                                        /s/ Donald C. Pogue
                                        Donald C. Pogue, Judge

Dated:     February 27, 2008
           New York, New York

## NOTICE OF ENTRY AND SERVICE

      This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

      Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

      Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

                                     Tina Potuto Kimble
                                     Clerk of the Court

Date: _____    By: _____
                                                            Deputy Clerk