Slip Op. 11-14

## UNITED STATES COURT OF INTERNATIONAL TRADE

DORBEST LTD., et al.,

       Plaintiffs,

         v.

UNITED STATES,

       Defendant.

Before: Pogue, Chief Judge
 Consol. Ct. No. 05-00003

## OPINION AND ORDER

[Commerce's remand determination remanded in part.]

Decided: February 9, 2011

Mowry & Grimson PLLC (Kristin H. Mowry, Jeffrey S. Grimson, Jill A. Cramer, Susan E. Lehman, and Sarah M. Wyss) for Dorbest Limited et al.;

King & Spalding LLP (Joseph W. Dorn, Stephen A. Jones, Jeffrey M. Telep, J. Michael Taylor, Daniel L. Schneiderman, and Ashley C. Parrish) for the American Furniture Manufacturers Committee for Legal Trade, et al.;

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini, Carrie A. Dunsmore, and Brian A. Mizoguchi); Rachael E. Wenthold, Senior Attorney, Of Counsel, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for the United States Department of Commerce; and

Trade Pacific PLLC (Robert G. Gosselink) on behalf of Dongguan Lung Dong/Dong He, et al.

**Pogue, Chief Judge:** In prior proceedings in this matter, the Court of Appeals for the Federal Circuit ("CAFC") held that when calculating surrogate labor rates for the valuation of goods from a nonmarket economy ("NME"), the Department of Commerce

("Commerce") must use data from countries that are both economically comparable to the NME and significant producers of comparable merchandise. Dorbest Ltd. v. United States, 604 F.3d 1363, 1372-73 (Fed. Cir. 2010)("Dorbest IV"). Dorbest IV thus required Commerce to redetermine, on remand, the labor rate applicable here. See Final Results of Redetermination Pursuant to Remand, Dorbest Ltd. v. United States, (Nov. 10, 2010)("Remand Results").

In its remand determination, choosing data from the record, Commerce calculated a labor wage rate by averaging  industry-specific earnings and/or wages from three countries – India, Indonesia and Pakistan – that it found to be both economically comparable to China and significant producers of wooden bedroom furniture. Based on these calculations, Commerce identified an average wage rate of 0.23 USD/hour and found that using that average wage rate as a surrogate for the cost of labor in the production of Plaintiff/Respondent Dorbest's merchandise, Dorbest has a de minimis dumping margin. Remand Results at 17, 42.

Plaintiff/Petitioner American Furniture Manufacturers Committee for Legal Trade ("AFMC") now seeks review of Commerce's data choices in that redetermination on remand.[1] AFMC challenges

---

[1] Dorbest does not challenge Commerce's remand determination. Dorbest's Comments on Fourth Remand Determination, Dorbest Ltd. v. United States, (Dec. 2, 2010).

four of Commerce's specific choices: 1) Commerce's initial selection of two "bookend" countries – the Philippines and Pakistan – to limit its consideration of countries with economies comparable to China, the NME at issue; 2) Commerce's exclusion of data not available during the original investigation; 3) Commerce's use of wage rate data from India alleged to be "capped" or limited to wages of workers making 1600 Rupees ("Rs.") per month or less; and 4) Commerce's calculation of an average surrogate wage rate using only countries for which industry-specific data was available.

After a brief review of the relevant procedural history, the agency's methodology, and the applicable standard of review, the court will explain why it concludes that, given the record as a whole, the first of Commerce's choices must be remanded but the other three data choices were reasonable and therefore must be sustained.


## BACKGROUND

### Procedural history

This matter arises from Commerce's investigation of whether wooden bedroom furniture from China was being dumped in the United States domestic market during the time period between April 1, 2003 and September 30, 2003. <u>Wooden Bedroom Furniture</u>

from the People's Republic of China, 68 Fed. Reg. 70,228 (Dep't Commerce Dec. 17, 2003)(Notice of Initiation of Antidumping Investigation).  Commerce's final determination in the original investigation was subsequently challenged and remanded three times before it was appealed to the CAFC.

In Dorbest IV, the CAFC invalidated Commerce's wage rate calculation regulation.[2]  This court then remanded for further proceedings in accordance with the CAFC decision.  Specifically, as noted above, the CAFC held that, contrary to Commerce's regulation, the governing statute, 19 U.S.C. § 1677b(c)(4),[3] requires that when calculating surrogate labor wage rates, Commerce shall "to the extent possible," use factors of production from market economies that are both economically comparable to the non-market economy country and significant

---

[2]  Prior to Dorbest IV, Commerce used a regression-based method for calculating wage rates pursuant to 19 C.F.R. § 351.408(c)(3).  See Dorbest IV, 604 F.3d at 1371.

[3] The statute states that:

[Commerce] shall utilize, to the extent possible, the prices or costs of factors of production in one of more market economy country that are:

    (A) at a level of economic development comparable to that of the nonmarket economy country, and

    (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4)(2011).

producers of the subject merchandise.  <u>Dorbest IV</u>, 604 F.3d at

1372 (citing 19 U.S.C. § 1677b(c)(4)(A)).

After <u>Dorbest IV</u>, Commerce acknowledged that the data on the

record was insufficient to comply with the court's remand order

and re-opened the administrative record to admit new wage data.

<u>Request for Comment Regarding Wage Rate Data</u>, A-570-890, Remand

Redetermination Investigation ("RRI") 4/1/03 - 9/30/03 (Aug. 11,

2010), Remand Admin. R. Pub. Doc. 1.  Commerce also invited

interested parties to submit comments and new factual information

with regards to the sole issue of labor wage valuation.  <u>Id.</u> at

2.  AFMC and Dorbest each submitted comments and wage rate data

for Commerce's consideration.

**<u>Methodology</u>**

Selecting from the record data, Commerce, in its remand

determination, specified five steps for calculating labor wage

rates ("the 5-step methodology").[4]

First, Commerce created a list of economically comparable

---

[4] The 5-step methodology that Commerce applied is described
in greater detail at <u>Analysis Memorandum for the Redetermination
Pursuant to Court Remand in the Antidumping Investigation of
Wooden Bedroom Furniture from the People's Republic of China: Rui
Feng Woodwork Co., Ltd. ("Rui Feng Shenzhen"), and their parent
company Dorbest Limited (collectively "Dorbest")</u>, A-570-890, RRI
4/1/03 - 9/30/03 (Oct. 8, 2010), Remand Admin. R. Pub. Doc. 8.

surrogate countries based on gross national income ("GNI").[5]  In

doing so, Commerce relied on its original surrogate country

memorandum,[6] which provided five economically comparable

countries for consideration as the primary surrogate country for

this investigation.[7]  Remand Results at 12; Surrogate country

memorandum.  The countries on the list in the surrogate country

memorandum are India, Pakistan, Indonesia, Sri Lanka and the

Philippines.  Remand Results at 12.  Using, as "bookends," the

high and low-income countries from that list, i.e., the

---

[5] In determining which countries are economically comparable
to China, Commerce relies primarily on GNI.  Remand Results at
12. Commerce's regulations specify that per capita gross domestic
product is to be given weight when selecting surrogate countries
to value production factors.  19 C.F.R. § 351.408(b) ("[Commerce]
will place primary emphasis on per capita GDP as the measure of
economic comparability").  Nonetheless, Commerce and AFMC both
rely on GNI throughout their discussion of which countries are
economically comparable to China. e.g. Remand Results at 12;
AFMC's Comments on Final Results of Redetermination Pursuant to
Remand,  Dorbest Ltd. v. United States, (Dec. 2, 2010) at 22
("AMFC Br.").

[6] The surrogate country memorandum states that the five
countries selected were all comparable to China in terms of per
capita GNP and national distribution of labor.  Memorandum from
Ron Lorentzen to Robert Bolling, "Request for a List of Surrogate
Countries," A-570-890, POI 4/1/03 - 9/30/03, Admin. R. Pub. Doc.
260 at 1 (Jan 16, 2004)("Surrogate country memorandum")("Per
capita GNP is the primary basis for determining economic
comparability.").

[7] When calculating an antidumping margin, Commerce selects
one country to act as the surrogate country from which it draws
data on all factors of production except labor wage rates.  This
country is known as the primary surrogate country.

Philippines and Pakistan, Commerce then added all countries with
World-Bank reported per capita GNIs that fell within the
"bookend" range.  Remand Results at 12-13.  This resulted in a
list of 24 countries.

Second, Commerce proceeded to identify which of the 24
listed countries had exports of comparable merchandise between
2001 and 2003.  Remand Results at 12.  At this step, Commerce
identified 13 countries from the list that were both economically
comparable to China and significant producers of comparable
merchandise.

Third, Commerce identified which of the 13 countries
reported wage data between 1997 and 2002.  Remand Results at 13.
In doing so, Commerce relied on the International Labor
Organization ("ILO") wage data from the base year and five years
prior.  See AFMC Br. at 8.  After applying this step, six
countries remained.

Commerce then added a fourth step to its methodology: It
identified which countries reported an industry-specific
classification within the ILO wage rate data.  Remand Results at
13-14.  In doing so, Commerce looked to data that was reported
according to the International Standard Industrial Classification

of all Economic Activities ("ISIC") code.[8]  Remand Results at 14.

Each updated ISIC code is known as a revision, and ISIC Revision

3 was the most recent reporting period available at the time of

the initial investigation.  Remand Results at 14 n.46.  Commerce,

however, chose to use an older revision, ISIC Revision 2, because

it contained a sub-classification most specific to the production

of wooden bedroom furniture.[9]  Remand Results at 15.  After

applying this step, three countries – India, Indonesia and

Pakistan  – remained on the list.  Id.

Finally, Commerce calculated an average wage rate for these

three countries by using wage rate data from a three-digit sub-

classification level, when that sub-classification was

available.[10]  Remand Results at 16.  Commerce used wage rate data

from India and Indonesia that was reported at this additional,

three-digit sub-classification level.  Pakistan, however, did not

report data at the three-digit sub-classification level;

_____

[8] For this and the next step, Commerce relied exclusively on
the most updated data that would have been available during the
original investigation.  Remand Results at 13.  Commerce used
wage data from 1997-2002 and adjusted it to the 2003 period of
investigation using the relevant Consumer Price Index.  Id.

[9] Commerce used industry-specific data from the two-digit
sub-classification 33, which is titled, "Manufacture of Wood and
Wood Products, Including Furniture."  Remand Results at 16.

[10] Here, Commerce used sub-classification 332, which is
titled, "Manufacture of Furniture and Fixtures, Except Primarily
of Metal."  Remand Results at 16.

therefore with regards to wage rate data from Pakistan, Commerce used data which was reported at the two-digit sub-classification level.  Id.  Commerce then calculated a simple average using this data.  See id.[11]

## STANDARD OF REVIEW

The court will sustain a Commerce redetermination on remand "if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." Jinan Yipin Corp. v. United States, __ CIT __, 637 F. Supp. 2d 1183, 1185 (2009)(citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

An agency determination is supported by substantial evidence when the record upon which it is based contains such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938).  In making this evaluation of the record, the court assesses whether the agency's data choices are reasonable considering the record as a whole. See Nippon Steel Corp. v.

---

[11] This is the first time that Commerce has included steps four and five in its methodology.  Furthermore, throughout the remand process Commerce has consistently used only data that was available during the time of the original investigation.  See, e.g., Final Results of Redetermination Pursuant to Court Remand, Dorbest, Ltd. v. United States (May 25, 2007).

<u>United States</u>, 458 F.3d 1345, 1351 (Fed. Cir. 2006).  At a minimum, in making its data choices, the agency must explain the standards it applied and make a rational connection between the standards and the conclusion.  See <u>Matsushita Elec. Indus. Co. v. United States</u>, 750 F.2d 927, 933 (Fed. Cir. 1984).  A rational connection is a connection that is supported by justification or evidence.  See <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1975) (explaining that, even under the narrower arbitrary and capricious standard of review, the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made" (quoting <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962))).[12]

## DISCUSSION

## I. Commerce's selection of countries to act as "bookends"

The first issue before the court is Commerce's initial selection of a pair of "bookend" countries to establish a range

---

[12] Moreover, a reviewing court should not attempt itself to make up for such deficiencies; "we may not supply a reasoned basis for the agency's action that the agency itself has not given." <u>Bowman</u>, 419 U.S. at 285-86 (citing <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947)); <u>Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade</u>, 412 U.S. 800, 807 (1973)(plurality)("[T]he agency must set forth clearly the grounds on which it acted.").

of GNI with which to identify a list of countries that qualify as economically comparable to China.[13]   AFMC contends that this choice is arbitrarily skewed towards countries with a per-capita GNI that is less than that of China.[14]

The high-income "bookend" country selected from the list in Commerce's original surrogate country memorandum was the Philippines, with a GNI of 1,020, and the low-income bookend country was Pakistan with a GNI of 410.[15]   Remand Results at 12; AFMC Br. at 23.   China's GNI at the time of the original

---

[13] Both AFMC and Commerce agree that there is a strong correlation between wage rates and per capita GNI.   See Remand Results at 30.   In addition, Commerce continues to find, and AFMC agrees, that data from multiple countries constitutes the best available information for the valuing labor input.   Remand Results at 10.   (The use of multiple countries to calculate the labor wage rate is not an issue that any party contests.)   Commerce cites, and AFMC acknowledges, the high variability and inconsistency between wage rates and GNI as the reason for using as many countries as possible when calculating an average wage rate.   See Remand Results at 11.

[14] Commerce asserts incorrectly that it is too late for AFMC to challenge the selection of surrogate countries because it did not challenge it when the memorandum was initially promulgated.   Remand Results at 31.   However, because this is the first time that the surrogate country memorandum has been used for this purpose, until now there was no reason for AFMC to challenge the countries listed therein.   See, e.g., Dorbest IV 604 F.3d at 1375 (citing Mittal Steel Point Lisas, Ltd. v. United States, 548 F.3d 1375, 1383 (Fed. Cir. 2008)), and United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952)).

[15] All GNI discussed here is in terms of United States dollars.

investigation was 1,100.[16]  AFMC Br. at 23.

AFMC asserts that the CAFC clearly intended Commerce to use countries with reported GNI's both above and below that of China in order to capture an absolute range of economically comparable countries.[17]  AFMC Br. at 22, 25.  AFMC also points out that the surrogate country memorandum was not drafted for purposes of calculating surrogate wage rates and therefore fails to account for absolute differences in GNI by listing countries both above and below China's GNI.  AFMC Br. at 23.[18]

AFMC also contends that Commerce has failed to provide a reasonable explanation for why it used the five countries listed

---

[16] The other three countries on the original surrogate country memo list all had GNIs lower than China's GNI. These three countries, Sri Lanka, Indonesia, and Pakistan, reported GNIs of 860, 740 and 510 respectively.  AFMC Br. at 23.

[17] In <u>Dorbest IV</u>, the CAFC noted that:

Here, there were five market-economy countries with gross national incomes less than that of China and an additional eleven countries with gross national incomes between one and two times that of China.  Although we need not resolve which of these countries, or which additional countries, could properly be considered economically comparable to China, some subset of these countries must surely fit the bill.

<u>Dorbest IV</u>, 604 F.3d at 1372.

[18] Instead, the surrogate country memorandum was intended as a non-exclusive baseline for determining a principle surrogate country for "factors other than labor."  AFMC Br. at 23; Surrogate country memo at 1.

in the surrogate country memorandum, given that their low GNIs
would necessarily predetermine an underestimated labor wage rate.
AFMC Br. at 23-24.  In support of this, AFMC notes that Commerce
has already recognized in an earlier proceeding that using only
wage rates from countries with high GNIs will likely lead to an
overestimated wage rate.  AFMC Br. at 24 (citing Dorbest, Ltd. v.
United States, 547 F. Supp. 2d 1321, 1327 (CIT 2008) ("Dorbest
II").  For AFMC, it follows that here, when Commerce selected
countries with GNIs lower than China, the data set "pre-ordained
an understated wage rate."  AFMC Br. at 23.

Commerce contends that it was instructed merely to base its
wage value on countries that are economically comparable to China
and that neither the statute nor Dorbest IV define a set range of
GNI to be used when determining economic comparability.  Remand
Results at 32.  Commerce notes that the countries on the
surrogate country memo were already determined to be economically
comparable to China and that the memo provided a sufficient
number of economically comparable countries to act as a starting
point.  Remand Results at 33.

Commerce's explanation is insufficient.  While Commerce has
discretion to determine the countries which will act as bookends
for its selection, it has not provided a reasoned explanation of
its "bookend" choices.  In particular, Commerce's remand decision

overlooks the explicit statement in the surrogate country memo
that the proposed list is non-exhaustive, allowing for the
possibility of introducing a more balanced range of countries
from which to draw labor wage rate data.  Surrogate country memo
at 1.

Here, both of the two bookend countries have GNIs that fall
below China's, resulting in a range of corresponding wage rates
that will likely fall below China's wage rates.  Given the high
correlation between per capita GNI and wage rates, a correlation
that Commerce acknowledges, Commerce's selection appears
arbitrarily biased towards the low end of per capita GNI.  See
Remand Results at 35-36 (acknowledging established global
relationship between wages and GNI); also Dorbest II, 547 F.
Supp. 2d at 1327.  Certainly Commerce does not have to achieve
mathematical perfection in its choice of countries to act as
bookends for its initial selection, but Commerce must explain why
it selected two countries with GNIs that are lower than China's
to use as bookends, and Commerce's explanation must rest "upon
principles that are rational, neutral, and in accord with the
agency's proper understanding of its authority."  FCC v. Fox Tel.
Stations, Inc. , 129 S. Ct. 1800, 1823 (Kennedy, concurring)
(2009); see, e.g., Matsushita Elec. Indus. Co., 750 F.2d at 933.
Without such an explanation, Commerce's determination is

arbitrary because it "fail[s] to consider an important aspect of the problem," and is therefore unreasonable.  SKF USA v. United States, 2011 WL 73179, *6 (Fed. Cir. Jan.7, 2011)(quoting Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43(1983)).

Commerce asserts that the CAFC's explicit directive to rely on data from countries that are economically comparable to China will "necessarily result in a truncated dataset."  Remand Results at 33.  But this argument misses the point.  While the CAFC's opinion has precluded the larger data sets that Commerce used in its invalidated regression-based methodology, that opinion did not hold that Commerce was restricted to using only countries with GNIs lower than China's.  On the contrary, the CAFC noted that there were at least 16 countries from which Commerce could draw.  Dorbest IV, 604 F.3d at 1372.  While the CAFC explicitly declined to address exactly which countries could properly be considered economically comparable to China, it left open the possibility that countries with GNIs higher than China's could be included in the range.  Id.  Commerce has not provided any adequate explanation as to why these higher-income countries are necessarily excluded from the starting selection of countries.

Finally, Commerce claims that the range of economically comparable countries is not unfair – just because that range is

not centered around China's GNI – and points out that there is no
statutory requirement that Commerce select the "most comparable
country." Remand Results at 33-34. AFMC responds that at a
minimum, Commerce should achieve "substantial balance" in its
data set by selecting bookend countries that are roughly equally
above and below China's per capita GNI.[19] Commerce replies that
focusing on the ranking of each country will create an "illusion
of precision." Remand Results at 34. In making this argument,
Commerce relies on <u>Fujian Lianfu Forestry Co., Ltd. v. United
States</u>, 638 F. Supp. 2d 1325, 1348-49 (CIT 2009), which held that
India was economically comparable to China despite a wide
difference between their respective GNIs (India 620, China 1290).

 <u>Fujian Lianfu Forestry</u> is distinguishable, however, because
it involved the choice of a single country to act as a primary
surrogate country. <u>See</u> <u>Fujian Lianfu Forestry</u>, 638 F. Supp. 2d
at 1347. Here, Commerce is selecting a range of countries.
Moreover, there is no indication here that the methodology
applied in <u>Fujian Lianfu Forestry</u> to select a primary surrogate
country is similar to the methodology for determining surrogate

_____

[19] AFMC also re-raises the argument that Commerce erred in
continuing to rely on data from the 2004 WDR Publication rather
than a 2010 download of the 2002 per capita GNI data. As
discussed *infra*, Commerce's decision to limit the data selected
for these remand results to data that was available during the
time of the original investigation is reasonable.

wage rates.  See id. at 1348-49.  On the contrary, in the context
of wage rate calculation, Commerce has stated that there is a
high correlation between wage rates and GNI.  Remand Results at
35-36.  Given this statement, Commerce has not explained, beyond
conclusory reasoning, how relying on broader GNI rankings of
countries could produce an "illusion of precision."  See Amanda
Foods (Vietnam), Ltd. v. United States, 647 F. Supp. 2d 1368,
1377 (CIT 2009)(holding that Commerce must provide more than
conclusory reasoning for treating all countries on surrogate
country memorandum as identical).

       For the above reasons, the court remands this issue to
Commerce so that it may 1) explain why it is justified in
selecting this particular pair of countries to act as bookends
for the selection process, in light of their low GNIs and the
high correlation between GNI and wage rates, or 2) otherwise
reconsider its determination in accordance with this opinion.


**II. Commerce's decision to use data available at the time of the
original investigation**

       AFMC next contends that Commerce's reliance on 2002 GNI data
and 2002 ILO wage data does not constitute use of the "best

available data" under 19 U.S.C.§ 1677b(c)(1).  AFMC Br. at 11.[20]
We disagree.

This court held in <u>Dorbest, Ltd. v. United States</u>, 462 F.
Supp. 2d 1262 (CIT 2006), that "given that administrative law
defines "available" in terms of the underlying investigation,
"available" may reasonably mean "available during the
investigation." <u>Dorbest</u>, 462 F. Supp. 2d at 1299 ("Dorbest
I")(citing <u>Vermont Yankee Nuclear Power Corp. v. Natural</u>
<u>Resources Def. Council, Inc.</u>, 435 U.S. 519, 555 (1978)).

AFMC contends that once an agency has reopened the record,
it must consider all evidence properly before it and therefore,
the best available information currently consists of the 2003 ILO
wage data.  AFMC Br. at 16.  AFMC's argument, however, disregards
the procedural posture of this case.  Remand proceedings do not
grant the parties the right to a new antidumping investigation

_____

[20] In calculating the surrogate wage rate, Commerce is
directed by statute to use the "best available information."  19
U.S.C. § 1677b(c)(1).  "Best available information" is not
defined in the statute; therefore Commerce has significant
discretion in making this determination.  <u>See</u> <u>Nation Ford Chem.</u>
<u>Co. v. United States</u>, 166 F.3d 1373, 1377 (Fed. Cir. 1999); <u>see</u>
<u>also</u> <u>Chevron, U.S.A. Inc. v. Natural Resources Defense Council,</u>
<u>Inc.</u>, 467 U.S. 837, 844 (1984); <u>Thai Pineapple Pub. Co. v. United</u>
<u>States</u>, 187 F.3d 1362, 1365 (Fed. Cir. 1999)(holding that
Commerce's methodologies are presumptively correct).  The CAFC
held in <u>Dorbest IV</u> that the requirement that Commerce use the
"best available information" may not be used to demand of
Commerce more than is required by the antidumping statute.  604
F.3d at 1373.

from the current date.  See, e.g., 2 Am. Jur. 2d  Administrative

Law § 575.  Rather, in remand proceedings, an administrative

agency must modify its original determination in accordance with

the remand order.  See id.

Here Commerce reopened the record to admit new data because

it needed a new type of data to comply with our remand order;

that order, however, did not require data from a different time

period.  See Request for Comment Regarding Wage Rate Data,

A-570-890, RRI 4/1/03 - 9/30/03 (Aug. 11, 2010), Remand Admin. R.

Pub. Doc. 1 at 2.  The error in Commerce's original determination

arose not from the time period for which the ILO wage data were

selected, but rather from the methodology applied to select the

data.[21]  See Dorbest IV, 604 F.3d at 1372-73.  Because we are to

treat Commerce's calculations on remand as if they were made at

the time of the original investigation, it is reasonable for

Commerce to consider only data that was available to it during

the original investigation, namely, the 2002 ILO wage data.  See

Vermont Yankee Nuclear Power Corp., 435 U.S. at 554-55

("[a]dministrative consideration of evidence . . . always creates

---

[21] AFMC cites to the authorities in Dorbest I supporting
their argument that "available" information is information before
the decision-maker when a determination is made.  AFMC Br. at 16.
Again, their interpretation fails to account for the procedural
posture of this case.  These are remand proceedings which
necessarily must be treated as the original investigation.  See,
e.g., 2 Am. Jur. 2d  Administrative Law § 575.

a gap between the time the record is closed and the time the administrative decision is promulgated")(citation omitted).

Asserting that Commerce's decision is not in accord with the statute, AFMC incorrectly cites Port of Seattle v. Fed. Energy Regulatory Comm'n, 499 F.3d 1016, 1035 (9th Cir. 2007).   AFMC's reliance misses the point.   In Port of Seattle, the Ninth Circuit reviewed a decision made by the Federal Energy Regulatory Commission ("FERC") which disregarded evidence added to the record after a preliminary evidentiary proceeding but before FERC rendered its final decision.   Port of Seattle, 499 F. 3d at 1025. Port of Seattle does not involve or address new data that was not available at the time of the original determination or investigation.[22]

In the alternative, AFMC contends that the decision to use only data available during the time of the original investigation is arbitrary and not supported by substantial evidence.   AFMC Br. at 17.   AFMC makes three arguments in support of this assertion.

---

[22] AFMC also asserts that Commerce's decision is not supported by substantial evidence because it has failed to take into account contradictory evidence present on the record.   AFMC Br. at 17.   Nonetheless, AFMC mis-states the case.   The evidence AFMC wishes Commerce to utilize is not contradictory, but rather, different, newer data of the same type being sought by Commerce. While this other data could result in a different margin for Dorbest, such a possibility does not necessarily render the data contradictory to the data Commerce used.

First, AFMC contests Commerce's finding that the interests
of administrative finality and efficiency overcome an interest in
conducting accurate fact finding and that allowing later-
discovered evidence sets an undesirable precedent.  AFMC Br. at
17-18.  AFMC argues that it is not attempting to circumvent the
finality of Commerce's determination with new evidence and that
Commerce has strayed from its own precedent in choosing not to
use the updated data.

The case AFMC relies on to make this argument, Shakeproof
Assembly Components Div. Of Illinois Tool Works, Inc. v. United
States, 30 CIT 1173, Slip Op. 06-129 (Aug. 25, 2006), does not
support AFMC's claim.  The court in Shakeproof upheld Commerce's
decision to reject evidence that was not contemporaneous with the
period of investigation and noted in dicta that Commerce has
traditionally used "valuation information contemporaneous with a
period of investigation or review."  Shakeproof, 30 CIT at 1177.
Here the data used by Commerce is contemporaneous with the period
of investigation in that it represents the data available at the
time of the original investigation.  Thus Shakeproof is not
contrary authority.

Second, AFMC asserts that 2003 ILO wage data was available
at the time of the original investigation because this court
acknowledged in Dorbest I that the 2004 download, which happened

to include 2003 data, was materially the same as the data
available during the original investigation.  AFMC mis-states our
finding in <u>Dorbest I</u>.  In <u>Dorbest I</u>, this court discussed the
availability of 2002 ILO wage data shortly after the original
investigation was completed and found that the 2004 download of
that data was materially the same.  <u>Dorbest I</u>, 462 F. Supp. 2d at
1299.  The availability of the 2003 ILO wage rate data during the
original investigation was not before us in <u>Dorbest I</u> and
therefore AFMC may not rely on <u>Dorbest I</u> to establish the
existence of the 2003 ILO wage data and its concomitant
availability during the original investigation.

    Finally, AFMC asserts that Commerce "cherry picked" from the
data, using both 2002 and 2003 ILO wage data in its calculations.
AFMC Br. at 20.  Commerce acknowledged in the remand results that
it needed to extract 2002 ILO wage data that had not been
retained at the time of the original investigation.  In the
remand results, Commerce stated that it relied on "a current
download of 2001-2003 export data" to determine which countries
were significant producers of comparable merchandise.  Remand
Results at 22.  AFMC asserts that there is no reasonable basis
for Commerce to conclude that the 2003 ILO wage data was not
available during the time of the investigation while at the same
time concluding that it was available.  AFMC Br. at 21.  Commerce

responds that, by necessity, certain portions of the data it used
were newly extracted, but that it relied upon data that would
have been available during the original investigation.
Defendant's Response to AFMC's Remand Comments, Dorbest Ltd. v.
United States, (Dec. 22, 2010) at 14 ("Commerce Reply Br.").
Commerce acknowledges that this is not a perfect procedure but
the best it can make of the available data sources.  Commerce
Reply Br. at 15.  This is reasonable.  Accordingly, Commerce's
decision to rely solely on data that would have been available
during the original investigation is affirmed.


## III.  Indian wage rate

     The AFMC next contends that Commerce's calculations are
unsupported by substantial evidence because they rely in part on
Indian wage data that appear to exclude workers making more than
Rs.1600 per month, and thus appears "capped" or limited to wages
under that amount.  AFMC Br. at 37.  We disagree.

     In support of its claim, AFMC cites the Annual Survey of
Industries (ASI), which can be read to indicate that a "cap"
limits the Indian wage data to the bottom 2% of wage earners.
Petitioners' Comments Concerning Draft Results of Redetermination
Pursuant to Remand in Dorbest Limited v. United States,
A-570-890, RRI 4/1/03 - 9/30/03 (Oct. 22, 2010), Remand Admin. R.

Pub. Doc. 13 at 35-37.  Commerce, however, declines to use this
information because it was not made available until 2006.  Remand
Results at 40.  As discussed *supra*, Commerce's decision to
exclude data that would not have been available at the time of
the original investigation is reasonable.  See <u>Dorbest I</u>, 462 F.
Supp. 2d at 1299.

In addition, Commerce further supports its stance by
explaining that the ASI data do not represent industry-specific
2002 wages.[23]  <u>See</u> Remand Results at 40 n. 99.  Commerce notes
that even though the 2003 ASI report on the record contains a
"trends" column which shows a FY 2002 country-wide rate, no
source data is on the record for this column, nor does the report
include industry-specific data, which is what Commerce used in
its calculations.  <u>Id.</u>  Thus Commerce decided that the ASI
submission is not an appropriate benchmark because, even if it
were available at the time of the original investigation, it does
not contain industry-specific 2002 ILO wage data and thus would
not be relevant to Commerce's calculations.[24]  This determination

---

[23] As discussed *infra*, Commerce has reasonably chosen to use
industry-specific data in its calculations.

[24] AFMC has placed on the record numerous pages extracted
from the ILO website which state that the ILO wage rate data is
capped.  <u>AMFC Comments Concering Wage Data Placed on the Record</u>
<u>on August 11, 2010</u>, A-570-890, RRI 4/1/03 - 9/30/03 (Aug. 16,
2010), Remand Admin. R. Pub. Doc. 3, Exhibit 6.  However, the
court finds this evidence unpersuasive because the record also

is reasonable.


## IV.  Commerce's calculation of the average wage rate

     Finally, AFMC challenges Commerce's data choices at the
fourth and fifth steps of the wage rate calculation, asserting
that Commerce's choices arbitrarily reduced the number of
countries from which Commerce could calculate a labor wage rate.
We disagree.

     AFMC argues that the use of industry-specific data from ISIC
Revision 2 is arbitrary and capricious because of Commerce's
stated preference for a large "basket" of countries from which to
choose.  AFMC claims that requiring industry-specific wage data
unnecessarily reduces the number of available countries from
which to draw data when country-wide wage data is available from
more countries.  AFMC Br. at 32.

     Commerce, in response, asserts correctly that the governing
statute is silent on this issue, leaving the determination to
Commerce's reasonable discretion.  See 19 U.S.C. § 1677b(c)(1).
Commerce explains that using industry-specific data is preferable

─────────────────

contains an email from an ILO representative stating that the
cited methodological description dates back to 1995 and has not
been updated since.  Id. at 377.   Because this e-mail suggests
that the data may not be capped, and in the absence of further
evidence on the record that the data is capped, Commerce's use of
the India wage rate data is reasonable.

because it comports with Commerce's long-standing practice of
valuing the most specific data for production factors, and, at
the very least, such data is more specific to the subject
merchandise than country-wide data.  Remand Results at 28-29.

     While Commerce acknowledges AFMC's concerns, it notes, and
we agree, that AFMC has failed to provide evidence to show that
industry-specific data are unsuitable for calculating wage rates.
Remand Results at 28.  Furthermore, AFMC's argument misses the
point.  Our inquiry here is not whether Commerce used a certain
number of countries in its calculations.   Rather it is whether
Commerce reasonably adhered to the remand order and the statutory
requirements set forth in 19 U.S.C. § 1677b(c)(4), and whether
Commerce's determination is supported by a reasonable reading of
the record evidence as a whole.

     Nonetheless, with regards to whether Commerce used the best
available information from the record, Commerce states that it
believes industry-specific data will yield the most accurate
results, and explains that it used ISIC Revision 2 because it
contains a two-digit sub-classification of industry-specific
wages which Commerce feels to be most relevant to the production
of wooden furniture.  Remand Results at 15 ("[Commerce]
identified the two-digit series most specific to wooden bedroom
furniture as Sub-Classification 33, which is described as

"Manufacture of Wood and Wood Products, Including Furniture").

Commerce also stated that it chose to use ISIC Revision 2 rather

than the updated Revision 3 because Revision 2 contained the

specific sub-classification which was more specific to, and thus

a better match for, the subject merchandise.[25]  Remand Results at

15.  Here, Commerce has explained the standards it applied and

made a rational connection between this standard and its decision

to use ISIC Revision 2 data.  See Matsushita Elec. Indus. Co.,

750 F.2d at 933.

For the reasons given above, Commerce's decision to use

industry-specific data is reasonable and in compliance with the

statutory requirements set forth in 19 U.S.C. § 1677b(c)(4).


### Conclusion

Accordingly, Commerce's initial selection of two "bookend"

countries – the Philippines and Pakistan – to limit its

---

[25] "[W]e find that the two-digit description under ISIC-Revision 2 Sub-Classification 33 ('Manufacture of Wood and Wood Products, Including Furniture') to be more specific and a better match for the wooden bedroom furniture industry than the applicable ISIC -Revision 3, Sub-Classification 36 two-digit description ('Manufacture of Furniture; Manufacturing NEC') since the ISIC-Revision-2 does not contain the broad catch-all category of 'manufacturing NEC,' or merchandise 'not elsewhere classified." Remand Results at 15.  In addition, Commerce explained that it found ISIC Revision 2 to be better because it contained source data from all the countries determined to be both economically comparable and a significant producer of the subject merchandise.

consideration of countries with economies comparable to China, is remanded for further consideration in accordance with this opinion.  Commerce shall have until March 28, 2011 to complete and file its remand determination.  Plaintiffs shall have until April 11, 2011 to file comments.  Defendant and Defendant-Intervenors shall have until April 25, 2011 to file any reply. Commerce's other data choices are affirmed.

It is SO ORDERED.

/s/ Donald C. Pogue
Donald C. Pogue, Chief Judge

Dated:    February 9, 2011
          New York, NY